UNITED STATES of America,
Plaintiff-Appellant,

v.

Duane G. WILLIS and Mary J. Willis,
Defendants-Appellees.

No. 76–2592.

United States Court of Appeals,
Sixth Circuit.

Argued June 13, 1978.

Decided Jan. 26, 1979.

As Amended May 8, 1979.

William D. Beyer, U. S. Atty., Cleveland, Ohio, Daisy G. Collins, Cleveland, Ohio, Leonard Schaitman, Mark N. Mutterperl, Appellate Section, Civil Division, Dept. of Justice, Washington, D. C., Robert E. Kopp, Richard A. Olderman, Washington, D. C., for plaintiff-appellant.

Richard L. Phillips, Benesch, Friedlander, Coplan & Aronoff, Cleveland, Ohio, for defendants-appellees.

Before EDWARDS, Chief Judge, and CELEBREZZE and KEITH, Circuit Judges.

KEITH, Circuit Judge.

The Small Business Administration (SBA), an agency of the United States government, appeals from a judgment of the district court denying its claims against Duane G. Willis and Mary J. Willis. Plaintiff commenced this action on December 22, 1975, alleging that the defendants were liable to it pursuant to a guaranty executed in conjunction with an SBA loan. The guaranty was assigned to the SBA upon default of the primary debtor and performance by SBA pursuant to its own guaranty. Jurisdiction was invoked pursuant to 28 U.S.C. § 1345. The district court held that the SBA was not entitled to any monetary recovery because it had failed to dispose of collateral securing the loan in a commercially reasonable manner. We affirm Judge Robert B. Krupansky's decision.

### FACTS

The facts are relatively straightforward. On March 22, 1972, Opticron, Inc., a Delaware Corporation, together with Opticron International, Inc., and Opticron of Pennsylvania, Inc., (hereinafter collectively referred to as Opticron) executed a $325,000 promissory note in favor of the Union Commerce Bank of Cleveland, Ohio (UCB). The note was guaranteed up to 90 percent by the SBA. In conjunction with Opticron's execution of the note and as an inducement for the extension of credit, defendants Duane G. and Mary Jayne Willis signed a separate instrument in favor of the UCB and its successors and assigns unconditionally guaranteeing the prompt payment when due of the principal and interest owed on the note.[1] That same day, all the corporate signatories to the promissory note executed security agreements in favor of the UCB, collateralizing the $325,000 loan with

---

1. On March 22, 1972, and as security for this same indebtedness, Benjamin F. Moats and Marjorie A. Moats executed a guaranty identical to the one signed by Defendants Duane G. and Mary J. Willis. The Government instituted an action against the Moats to collect pursuant to the guaranty instrument executed by them on August 2, 1976, *United States v. Benjamin F. Moats and Marjorie Ann Moats*, (N.D.Ohio C. 76–777), the day before the trial in the in-

all assets of the several corporations, except cash.

Opticron defaulted on the note. SBA loan officer Gordon Miller met on February 1, 1973, with representatives of Opticron, UCB and other interested parties regarding the financial position of Opticron. On February 7, 1973 the UCB requested payment from the SBA of 90 percent of the $325,000 loan pursuant to the SBA guaranty agreement.

The SBA subsequently took possession of the assets and operations of Opticron and placed a notice in the Business Opportunity Section of the Sunday Cleveland Plain Dealer, February 18, 1973, advertising a summary public auction sale to be held on Thursday, February 22, 1973, at the offices of Opticron. The notice contained a minimum bid requirement of $150,000.

On February 21, 1973, the SBA paid to the UCB the sum of $296,530, being payment in full of 90 percent of the $325,000 loan, plus 90 percent of the interest due on the loan. The February 22, 1973 auction did not take place as advertised. Apparently, questions were raised as to the legal sufficiency of the notice and so none of the parties present would place a bid. On March 13 and 14, and April 12, 1973, however, the public auction sales were held, and $47,456.63 was realized from the sale of Opticron's assets. Deductions from gross sales for rent, expenses and auctioneers' fees resulted in net proceeds of $41,115.47 from all auction sales.

In the meantime, Opticron had received two firm private offers to purchase its assets. On January 30, 1973, an offer from Will Ross, Inc. (Will Ross) to purchase all of the assets of Opticron as reflected on the latter's November 30, 1972 balance sheet for the sum of $200,000 cash was communicated by letter to Opticron's Board of Directors. On January 31, 1973, a prior offer from Marcrum Optical of Florida, Inc. (Marcrum) to purchase all assets as reflected on the January 30, 1973 balance sheet of Opticron for $210,000 was confirmed by letter. Marcrum offered to pay $100,000 in cash with the remaining $110,-000 to be paid over a period of 10 years.

At the above-mentioned meeting on February 1, 1973, defendant Duane Willis communicated these two offers to the interested parties then present, *viz.*, Gordon Miller of the SBA and a representative of the UCB. With the apparent concurrence of all present, a telegram dated February 2, 1973, was sent to Will Ross accepting its offer subject to the final agreement and concurrence of UCB.

Subsequent to the February 1, 1973 meeting, Miller informed Willis that a public sale was *necessary* to dispose of the assets collateralizing the promissory note. Thereafter, the aforementioned advertisement of the summary public auction ran in the Cleveland Plain Dealer on February 18, 1973.

Notwithstanding the receipt of $41,115.47 from the auction sales, the SBA seeks by this action to recover from defendant guarantors the full amount of the loan principal outstanding plus accrued interest; a total of $297,174.66 plus daily interest of $43.9071 from December 27, 1974. At trial, defendants asserted that the sale of Opticron's assets was not conducted in a commercially reasonable manner and that plaintiff had the burden of establishing the commercial reasonableness of the sales. The plaintiff countered by asserting that the defense of commercial reasonableness was not available to defendants and that, in any case, the burden of proof on that issue rested with

stant action commenced. At the beginning of the trial below in the instant action, August 3, 1976, the Government's counsel moved for a continuance partly on the grounds of permitting adequate time for the parties in the second action to be served so that the two actions might be consolidated. The trial judge overruled this motion and proceeded with the trial of the instant action. The second action filed by the Government is presently pending before this court as a separate appeal. *United States of America v. Benjamin F. Moats and Marjorie Ann Moats*, Case No. 77–3502.

the defense. The district court found that the defense was available to the defendants and that once it had been raised, the burden of establishing the commercial reasonableness of the sales in question rested with the plaintiff. Additionally, the court found that the Government had failed to carry its burden.

The Government presents four issues for decision on appeal: 1) whether unconditional guarantors can avail themselves of the defense of commercial reasonableness to defeat its alleged federal right of recovery; 2) assuming the defense is available to unconditional guarantors, whether the defendants are estopped to assert it; 3) whether defendants proved at the trial below that the sale of Opticron's assets was commercially unreasonable; and, 4) whether the district court erred in denying SBA any monetary recovery. These issues will be addressed in the order in which they have been set out above.

## I.

### Availability of the Defense of Commercial Reasonableness

The Government makes two arguments in support of its contention that the defense of commercial reasonableness is unavailable to the defendants in this action. First, the Government argues that this case is controlled by federal law, which does not recognize the defense. The Government's second argument is three-pronged. First, it focuses upon the fact that the guaranty executed by the defendants made them "unconditional guarantors" of the indebtedness secured by the guaranty.[2] As such, contends the Government, defendants have an absolute contractual duty to repay the debt upon default by the primary obligor.

As a secondary component of the above argument, the Government urges that the agreement itself controls this case and that the fact of unconditional guaranty, coupled with other language contained in the agreement regarding the SBA's powers to deal with the collateral, conferred upon its discretion so broad that it placed upon defendants an absolute duty of repaying the loan regardless of any dereliction attributable to the SBA—i. e., that it relieved the SBA of any and all duties whatsoever to defendants in dealing with the collateral.

Finally, the Government contends that general principles of commercial law precludes the availability of the defense of commercial reasonableness in the instant case.

### A. Applicable Law

Emphasizing that the alleged right of recovery is a federal one, the Government argues that this case is controlled by federal law and that there is no basis in federal law for defeating the SBA's right of recovery. In support of this contention the Government points to the SBA's choice of Law regulation, 13 C.F.R. § 101.1(d)(2). This regulation provides:

> Instruments evidencing a loan, obligation of security interest in real or personal property payable to or held by the Administration or the Administrator, such as promissory notes, bonds, guaranty agreements, mortgages, deeds of trust, and other evidences of debt or security shall be construed and enforced in accordance with applicable Federal Law.

Additionally, the Government points to the note guaranteed by defendants, which provides in part:

> This promissory note is given to secure a loan which SBA is making or in which it is participating and, pursuant to Part 101 of the Rules and Regulations of SBA (13 C.F.R. 101.1(d)), this instrument is to be construed and (where SBA is the holder or a party in interest) enforced in accordance with applicable Federal Law.

**2.** The guaranty executed by defendants provided in pertinent part:

". . . the undersigned hereby unconditionally guarantees to the Lender, its successors and assigns, the due and punctual payment when due . . . of the principal of and interest on and all other sums payable, or stated to be payable, with respect to the note of the Debtor. . . ."

■ In opposition, appellees argue that Ohio law controls this case,[3] and that there is no compelling reason to apply federal law here to override state law requirements. Appellees argue further that, in any event, there is no federal substantive law to be applied here which differs from that upon which the district court based its decision.[4] We agree with appellant that, by virtue of the regulation pursuant to which this loan transaction was entered into and the specific language contained in the promissory note, federal law is controlling in this case.[5] However, while this conclusion establishes the confines within which the issues raised on this appeal must be decided, it does not dispose of them. For while the above-cited regulation and note provision are sufficient to establish federal law as the controlling authority, there still remains the crucial question of what substantive federal rule is to be applied. Appellant has not pointed to, and this Court has been unable to find through its own efforts, any substantive

federal law in accordance with which the rights of these parties are to be determined.[6]

■ The Government apparently would have this Court fashion its own federal common law rule as it is clearly empowered to do pursuant to the authority recognized by the Supreme Court in *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943). The issue before the Court in *Clearfield, supra,* was whether state or federal law was to govern the rights and duties of the United States in regard to the commercial paper it issues. The Supreme Court observed:

> The rights and duties of the United States on commercial paper which it issues are governed by federal rather than local law. When the United States disburses its funds or pays its debts, it is exercising a constitutional function or power. This check was issued for serv-

3. Appellees point out that 1) both the guaranty instrument and the promissory note contain at the end a warning required only under *Ohio Revised Code* § 2323.13; 2) both the guaranty and the promissory note contain the cognovit provision unique to Ohio and a few other states; 3) all pertinent documents involved show that the transaction was to be governed by the Uniform Commercial Code; 4) paragraph 13 of the security agreement executed by Opticron provided that, upon default, the secured party shall "have the remedies for a secured party under the laws of the State of Ohio"; and, 5) the guaranty does not contain the "federal law" applicability provision set forth in the promissory note.

Since Ohio has adopted the Uniform Commercial Code, Ohio Revised Code §§ 1301, *et seq.,* appellees' contention that state law controls this case is, in essence, an argument for application of the UCC to the facts of this case. Thus, the import of appellees' contention is that the UCC § 9–504(3) commercial reasonableness defense is available in the instant case by virtue of having been made a part of Ohio's statutory law. *See Ohio Rev. Code* § 1309.-47(C).

4. The district court concluded that the Uniform Commercial Code is applicable to this case. However, the court failed to specify whether the UCC applied by virtue of the court's incorporation of the relevant provisions as the federal rule of decision or by force of applicable state law. *See Ohio Revised Code* § 1309.-47(C).

Upon our handling of the issue, the UCC is applicable to decide the outcome of this case as a matter of federal incorporation and not as a matter of Ohio state law. In other words, the operative authority for the application of the UCC in this case is federal, not state. *See* Mishkin, "Variousness of Federal Law: Competence and Discretion in the Choice of National and State Rules for Decision," 105 U.Pa.L. Rev. 797 (1959).

5. *See* footnote 4, *supra.* In agreeing with appellant that federal rather than Ohio law is controlling in this case, we also reject appellees' assertion that the instant case is sufficiently similar to *United States v. Yazell*, 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966), so as to justify the application of state law to the transactions involved herein on the same basis as the Texas law of coverture was invoked in that case to defeat the SBA's right to recover on a note. In *Yazell, supra,* the Court stressed the fact that the loan in question had been individually tailored without any indication by the SBA that Texas law would not apply. The same clearly cannot be said about the transaction involved in the instant case.

6. This is not a case where comprehensive federal regulations intended to create a uniform system for determining the SBA's rights as guarantor, which in their operation were expected to displace state law, have been promulgated. *See United States v. Shimer,* 367 U.S. 374, 81 S.Ct. 1554, 6 L.Ed.2d 908 (1961).

ices performed under the Federal Emergency Relief Act of 1935, 49 Stat. 115. The authority to issue the check had its origin in the Constitution and the statutes of the United States and was in no way dependent on the laws of Pennsylvania or of any other state . . . The duties imposed upon the United States and the rights acquired by it as a result of the issuance find their roots in the same federal sources . . . In absence of an applicable Act of Congress it is for the federal courts to fashion the governing rule according to their own standards.

318 U.S. at 366–367, 63 S.Ct. at 575 (citations and footnote omitted). In reaching a decision as to the rule of law to be applied, i. e., the decision to fashion its own federal common law rule, the Court stated:

In our choice of the applicable federal rule we have occasionally selected state law. But reasons which may make state law at times the appropriate federal rule are singularly inappropriate here. The issuance of commercial paper by the United States is on a vast scale and transactions in that paper from issuance to payment will commonly occur in several states. The application of state law, even without the conflict of laws rules of the forum, would subject the rights and duties of the United States to exceptional uncertainty. It would lead to great diversity in results by making identical transactions subject to the vagaries of the laws of the several states. The desirability of a uniform rule is plain.

318 U.S. at 367, 63 S.Ct. at 575 (citation omitted). And commenting on the type of case which it has found appropriate for the fashioning of a federal common law rule,

the Supreme Court stated twenty-three years later in *United States v. Yazell*, 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966):

This Court's decisions applying 'federal law' to supersede state law typically relate to programs and actions which by their nature are and must be uniform in character throughout the Nation.

382 U.S. at 354, 86 S.Ct. at 507.

This case also presents a situation where the Government's operations are on a vast scale, involving transactions which occur in several states. However, the factors which militated in favor of fashioning a new and different federal common law rule in the *Clearfield Trust* case, as opposed to adopting state law, are not as strong in the instant case. While this case presents a situation where the need for uniformity is clear, this need is met by adoption of the relevant provisions of the Uniform Commercial Code as the federal rule of decision.[7] The Uniform Commercial Code has been enacted and is operative in 49 states (Louisiana excepted) and the District of Columbia.[8] Moreover, it is the culmination of years of exhaustive study and effort, the purpose of which was to simplify, clarify, modernize and make uniform the laws of various jurisdictions concerning commercial practices and transactions.

Additionally, policy factors also militate in favor of adopting the UCC provision in question as the rule of decision in this case. Involved here is a uniform provision which imposes upon a creditor a duty of good faith in disposing of collateral entrusted to it. Its apparent purpose is to protect debtors from unnecessary loss upon sales of the collateral by their creditors following foreclosure.[9] Adoption of state law as the fed-

---

7. Ohio has adopted the model version of the UCC provision in question and to the extent that we adopt the UCC as the federal rule in this case, we apply Ohio law. However, we are not prepared to say that the same result would follow had Ohio instead adopted the UCC with some quaint modification. *See United States v. Lowell*, 557 F.2d 70 (6th Cir. 1977); *United States v. Terrey*, 554 F.2d 685 (5th Cir. 1977); *United States v. Carson*, 372 F.2d 429, 434 (6th Cir. 1967).

8. Thus, there is no difficulty here in determining which state rule to apply.

9. This purpose appears to be at least on par with that served by the federal common law rule that protects both primary obligors and guarantors from having to bear the costs of lawsuits unnecessarily instituted. *See United States v. Anderson*, 366 F.2d 569 (10th Cir. 1966). It should make no difference that in-

eral rule of decision in these circumstances does not appear to unduly burden the Government; all it need do is exercise good faith in the disposition of collateral entrusted to it. This much we would hope it would do even without the rule and appears to be no more than a fair requirement in any case.

■ Thus, unless we are inclined to the view that the Government, simply because it is the Government, is entitled to collect from its debtors regardless of its own capriciousness in disposing of collateral entrusted to it to secure indebtedness, there would appear to be no good reason for departing from state law in this case. Since we are inclined to no such view, we have concluded that, given the circumstances presented in this case, the UCC should apply as the federal rule of decision. After all, as the Supreme Court observed in *Clearfield, supra*, the Government does business on business terms. 318 U.S. at 369, 63 S.Ct. 573. This case provides no basis for creating an exception.

## B. General Commercial Law Principles

The Government does not dispute the general availability of the defense of commercial reasonableness to primary debtors. It even appears to concede the availability of this defense to guarantors in some cases. However, the Government maintains that this defense is never available to guarantors in situations such as the one presented in the instant case.

In support of this contention, the Government draws first upon the fact that the guaranty executed by the defendants made them "unconditional guarantors" of the indebtedness secured. As such, the Government contends, defendants "have an absolute contractual responsibility to pay the debt at issue here." (Appellant's Br. at p. 50). The import of this argument appears to be that the defense of commercial reasonableness is unavailable to defendant simply by virtue of the fact that the guarantee

was "unconditional." On the Government's theory, an unconditional guarantor assumes an absolute contractual obligation which, upon becoming operative, is dischargeable only by payment.

■ While this proposition does have a certain superficial appeal by virtue of its seemingly tautological logic, it fails to comport with the conventional meaning of the term "unconditional guaranty." In *Pavlantos v. Garoufalis*, 89 F.2d 203 (10th Cir. 1937), the Tenth Circuit defined and explained this term as follows:

Contracts of guaranty are divided into two kinds. One is absolute or unconditional and the other is conditional. An absolute guaranty is an unconditional undertaking on the part of the guarantor that the person primarily obligated will make payment or will perform, and such a guarantor is liable immediately upon default of the principal without notice. A conditional guaranty is an undertaking to pay or perform if payment or performance cannot be obtained from the principal obligor by reasonable diligence. *An absolute guaranty, unlike a conditional one, casts no duty upon the creditor or holder of the obligation to attempt collection from the principal debtor before looking to the guarantor . . .* Both presuppose default by the principal.

89 F.2d at 206 (citations omitted and emphasis added).

The above-quoted definition and discussion make clear that the term "unconditional guaranty" has meaning only when contrasted with a "conditional guaranty" and that the significance of distinguishing between these lies primarily with the difference in the creditor's duty to proceed against the principal obligor before attempting to collect from the guarantor.

■ The issue in the instant case is whether and, if so, to what extent a secured party can collect a deficiency from guarantors after being charged with having need-

---

stead of the costs of an unnecessary lawsuit we have here a deficiency which possibly has been

unnecessarily enlarged by the capricious acts of the creditor.

lessly dissipated the collateral which might have substantially reduced, if not completely extinguished, the indebtedness secured by the guaranty. The issue here is not the secured party's duty to pursue the primary obligor before going after the guarantors.[10]

■ Second, the Government points to the language in the guaranty pertaining to its power in regard to the collateral upon default to support its contention for the unavailability of the defense of commercial reasonableness in the instant case. The Government emphasizes the language in the guaranty conferring upon the secured party "full power, in its uncontrolled discretion . . . to deal in any manner with the . . . collateral," including the power to realize on the collateral "at any public or private sale or sales." Additionally, the Government points to language providing that the obligations of the debtor "shall not be released, discharged or in any way affected, nor shall the debtor have any rights or recourse against the lender, by reason of any action lender may take or omit to take under the foregoing powers."

The import of this argument appears to be that the above-quoted language, in conjunction with the fact that the guaranty was unconditional, relieved the SBA of any duty whatsoever to defendants in dealing with the collateral. Carried to its logical extreme, the Government's view would permit it to collect the indebtedness from the guarantor even in a case where it had simply given the collateral away, or worse, destroyed it.

We reject this interpretation of the guaranty and hold that even the contractual obligations of unconditional guarantors are protected from unnecessary expense by the doctrine of commercial good faith. *See Anderson, supra.* To the extent the fair market value of Opticron's assets exceeded the amount for which they were actually sold, the deficiency pursuant to the note was clearly enlarged beyond what it might otherwise have been. And to the extent the SBA might reasonably have obtained a higher price for these assets, this enlargement of the deficiency was unnecessary.

In essence, we hold today that, as a matter of federal law, even the broad language quoted above will not be deemed to relieve the SBA of any and all responsibility to debtors in disposing of collateral securing its loans.[11] This Court cannot and will not sanction the kind of economic waste and financial hardship the Government's interpretation of this language has the potential of bringing about. The guaranty agreement executed by defendants clearly conferred broad power and discretion upon the SBA to deal with the collateral upon Opticron's default. However, it is our belief that the discretion conferred was never intended to be boundless, and that the powers conferred carry with them a duty to exercise them in a good faith attempt to maximize the proceeds of sale.

Moreover, a number of federal courts have permitted guarantors to invoke the defense of commercial reasonableness. *See United States v. Terrey,* 554 F.2d 685 (5th Cir. 1977); *United States v. Whitehouse Plastics* (5th Cir. 1974) 501 F.2d 692, *cert.*

10. Similarly, this is not a case involving the secured party's obligation to pursue collateral additional to the guaranty before attempting to collect on the guaranty itself. The failure of a secured party to diligently enforce its rights against collateral security additional to the guaranty, held to secure the note of the debtor, clearly would not discharge a guarantor's duties pursuant to an unconditional guaranty. *Duke v. Reconstruction Finance Corporation,* (4th Cir. 1954), 209 F.2d 204, *cert. denied,* 347 U.S. 966, 74 S.Ct. 777, 98 L.Ed. 1108. Nor is this a case where the secured party is proceeding against the guarantor for a deficiency after having lost access to the collateral securing the

indebtedness by its failure to comply with state filing requirements with which it had no duty to comply in the first place. *See Joe Heaston Tractor & Implement Co. v. Securities Acceptance Corp.,* 243 F.2d 196 (10th Cir. 1957). And while the fact of unconditional guaranty may at times be relied upon to define the extent of the underlying obligation, *Joe Heaston Tractor, supra,* the present case is not one where such an exercise would have legal significance.

11. It should be noted that this interpretation of the guaranty is derived as a matter of federal law. *See United States v. Beardslee,* 562 F.2d 1016 (6th Cir. 1977).

*denied,* 421 U.S. 912, 95 S.Ct. 1566, 43 L.Ed.2d 7; *United States v. Newton Livestock Auction Market, Inc.,* 336 F.2d 673 (10th Cir. 1964); *Dynalectron Corporation v. Jack Richards Aircraft Co.,* 337 F.Supp. 659 (W.D.Okl.1972); *Mercantile Financial Corporation v. Miller,* 292 F.Supp. 797 (E.D. Pa.1968). We see no good reason why the defense should not be permitted to the guarantors in the instant case.[12] The defense of commercial reasonableness is clearly germane to the cause of action pleaded by the Government and we see no reason why it should be considered personal to the primary debtor. Since this defense would have been available to Opticron in a suit on the note brought against it by the Government to recover a deficiency, it should be available to the defendants in the instant action. As already noted, the Government gains nothing by virtue of the fact that the guaranty presently under consideration is "unconditional." [13]

■ The Government attempts to distinguish the above cases on two grounds. First, it argues that their holdings are limited to instances where there has been a failure by the secured party to comply with the relevant notice provisions of the UCC prior to sale. Their applicability being so limited, urges the Government, their hold-

ings cannot be applied to cases where, as here, the crucial question concerns a public versus a private sale.

This distinction is without legal significance. The crucial question under consideration concerns "commercial reasonableness;" this remains so whether the factual context in which the issue is presented focuses upon proper notification prior to sale or the manner in which the sale is actually consummated. Having concluded that the standard to be applied is that of "commercial reasonableness," we hold that this requirement must be satisfied whether the facts involve a commercially reasonable notice prior to sale, or the commercial reasonableness of the sale itself.

■ Second, the Government argues that the above cases all involved actions by lenders to obtain deficiency judgments while the instant case is not one seeking a deficiency judgment, but rather, an action on a contract.[14] Consistent with this line of argument, the complaint in the instant action prayed for recovery of the full amount presently due on the note plus interest, without allowance for proceeds from the auction sales. Since the terms of the contract are controlling, the Government argues, we need not look behind it. The

---

12. As to the general availability of defenses to guarantors, 38 C.J.S. Guaranty § 88 at 1259–1260 (1943), provides:

> "It may be stated generally that, in order that any matter may constitute a good defense to an action on a guaranty, it must be germane to the cause of action pleaded and present a legal reason why the guarantee should not recover.
>
> In general, the guarantor may set up any defense that would have been available to the principal obligor, against the guarantee, at least where they are both sued in the same action; and, on the other hand, matters relating to the principal contract and its performance which would not be available as defenses to the principal, are generally unavailable to the guarantor. However, the guarantor cannot assert as a defense matters affecting the liability of the principal which are personal to the principal.

(Footnotes omitted). The requirements set out above appear to have been met in the instant case.

13. Appellees also contend that the § 9–504(3) defense of commercial reasonableness is available to them by virtue of their coming within the definitions of "debtor" contained in § 9–105(1)(d). We need not address this issue.

14. When questioned by the district judge regarding this purported distinction, the Government's attorney failed to adequately respond. Furthermore, the basis for this purported distinction is confused by virtue of the fact that on page 2 of the "Supplemental Memorandum of the Appellant" filed in connection with this appeal, the Government states that the guaranty agreement executed by the Willises "expressly makes the Willises liable for a *deficiency* judgment." [Emphasis added]. As the Court concludes that the Government's attempted distinction between this action and an action for a deficiency judgment is without legal significance, we need not address the confusion created by the apparent inconsistency between its position at trial and here on appeal, and the above statement from its Supplemental Memorandum.

Government appears to be arguing that under the guaranty agreement at issue, the Willises remain liable for the full amount of the indebtedness because they agreed to "unconditionally guarantee" repayment of the entire loan in the event of default. This language, the Government contends, unambiguously placed upon the Willises an absolute burden of repaying the loan regardless of any dereliction allegedly attributable to the SBA. As noted above, if we were to accept this argument, the Government could simply give the collateral away, or wantonly destroy it, and still proceed to collect not only the deficiency created by its own capriciousness, but the entire indebtedness outstanding, exclusive of any credit of proceeds which might have been realized from the collateral. This Court will not tolerate any such potential for capricious waste.

We are in agreement with the trial judge, that the distinction which the Government attempts to draw between this action and an action to obtain a deficiency judgment is one with neither factual support nor legal significance.

## C. The Estoppel Argument

Section 9–504(3) provides in part:

Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.

The Government contends that, even assuming the availability of the defense provided in the above section to unconditional guarantors, the appellees are estopped from asserting the defense in the circumstances of this case by virtue of UCC § 9–507(1). Section 9–507(1) provides in pertinent part:

If it is established that the secured party is not proceeding in accordance with the provisions of this Part disposition may be ordered or restrained on appropriate terms and conditions.

Comment No. 1 to § 9–507(1) provides in part by way of explanation:

The principal limitation on the secured party's right to dispose of collateral is the requirement that he proceed in good faith (Section 1–203) and in a commercially reasonable manner. See Section 9–504. In the case where he proceeds, or is about to proceed, in a contrary manner, it is vital both to the debtor and other creditors to provide a remedy for the failure to comply with the statutory duty. This remedy will be of particular importance when it is applied prospectively before the unreasonable disposition has been concluded. This Section, therefore, provides that a secured party proposing to dispose of collateral in an unreasonable manner, may, by court order, be restrained from doing so, and such an order might appropriately provide either that he proceed with the sale or other disposition under specified terms and conditions, or that the sale be made by a representative of creditors where insolvency proceedings have been instituted. The Section further provides for damages where the unreasonable disposition has been concluded, and, in the case of consumer goods, states a minimum recovery.

The crux of the Government's argument here is that § 9–507(1) gives to the debtor and other secured parties the right to judicially test any suspect sale of collateral before its consummation. Since appellees were aware of both private offers to purchase Opticron's assets well in advance of the public sales, appellant asserts that their failure to even attempt to have the sales enjoined estops them from now complaining of the unreasonableness of those sales.

 We agree with appellees that the "estoppel" argument advanced by the SBA is tantamount to the proposition that a debtor must always proceed affirmatively under § 9–507(1), rather than defend under § 9–504(3). We are of the opinion that § 9–507(1) provides a right to, rather than impose a duty upon, debtors. Invocation of its provisions as urged by appellant would fly in the face of every court decision af-

fording to debtors defenses by reason of § 9–504(3). While there may well be cases where we would find the proposition contended for by appellant acceptable, this is clearly not one of them. Moreover, the actions of the SBA came within a period and under circumstances providing appellees with neither sufficient opportunity nor good reason to expect they might need to seek protection by a court. The original notice of sale set the minimum acceptable bid for Opticron's assets at $150,000. While the auctioneer hired to conduct the sale provided an estimate of $45,000 for the assets upon public sale, the record does not reveal that this estimate was ever communicated to defendants.

As the Court has determined that the UCC defense of commercial unreasonableness is available to defendants and that they are not estopped from asserting that defense in the instant case, we now turn to the consequences which follow upon these prior determinations.

## II.

### Commercial Reasonableness of the Sale

#### A. Effect of Raising the Defense

■ As noted above, the defense of commercial reasonableness is available in this case and was raised by the defendants at the trial below. While courts differ as to the effect of asserting this defense, it appears that the great weight of authority holds that it has the effect of shifting the burden of proof on this issue to the secured party. 59 A.L.R.3d, p. 369 (1974); *Vic Hansen & Sons, Inc. v. Crowley*, 57 Wis.2d 106, 203 N.W.2d 728 (1973); *Dynalectron Corp. v. Jack Richards Aircraft, supra*, 69 Am. Jur.2d, *Secured Transactions*, § 623, pp. 520–531 (1966). This also appears to be the position taken by the courts of Ohio. *See In re Frye*, 9 UCC Rep.Ser. 913, 921 (S.D. Ohio 1970). We see no reason not to follow this authority as did the district court below.

The district judge made it clear to the Government at the outset of the trial below that it had the burden of proof on his issue.

Yet, despite this notice, the Government's only proof regarding this issue at trial focused upon the reasonableness of the public sale which it conducted. Even in its briefs filed in connection with its appeal to this court, the Government still restricts its argument to the proposition that the auction was properly conducted. The entire thrust of the Government's proof and argument appears to be that proof that the collateral was properly sold in a recognized market by means of an accepted method of disposition, i. e. an auction sale, is also proof that the sale was commercially reasonable.

■ This Court cannot accept the Government's argument because it rests on the assumption that a properly conducted public sale is inherently reasonable, a premise which is clearly false. In *Old Colony Trust Co. v. Penrose Industries Corp.*, 280 F.Supp. 698 (E.D.Pa.1965), the Court stated:

Although the words of § 9–504(3) seem to grant the secured parties an absolute option of whether to have a public or private sale, it seems unwise to take such words literally. To begin with, the second sentence of § 9–504(3) would at least seem to include within the words "method, manner, time, place and terms" the fundamental choice of public versus private sale, and thus the secured parties must choose between a private or public sale according to which, if either, is the more "commercially reasonable."

280 F.Supp. at 712. At a later point, the court notes:

Commentary on Article 9 has convincingly pointed out that "[t]he policy of Article 9 is to provide a simple, efficient, and flexible tool to produce the maximum amount from the disposition of the collateral." To effectuate this, § 9–504 "attempts to chart a path in the narrow area between two policy positions—one a desire to impede dishonest dispositions, and the other, a reluctance to strangle honest transactions with red tape.

280 F.Supp. at 714–715 (footnote omitted). Finally, the court notes, and we agree:

The relevant test is thus whether every aspect of the sale is commercially reasonable. It is commercially reasonable if the party (1) acts in good faith, (2) avoids loss, and (3) makes an effective realization. Furthermore, the party may obtain court approval if he (4) sells in the usual manner in a recognized market, or (5) sells at the current price in a recognized market, or (6) sells in conformity with reasonable commercial practices among dealers in the type of property.

280 F.Supp. at 715. In light of the above, we think it is clear that the Government did not have absolute discretion in choosing between a public and a private sale. Whatever discretion it had in choosing the method of sale was limited by its good faith duty to maximize the proceeds upon sale of the collateral. If the original choice of method was unreasonable, we think it matters little, if at all, that this unreasonable choice was executed in a reasonable and proper fashion.

██ Moreover, we are of the opinion that the Government's choice of a public sale as opposed to a private sale in the circumstances of this case was unreasonable. The evidence establishes that at the time the Government decided on the public sale, it had firm and outstanding offers of $200,000 and $210,000, respectively. The Government knew of these two offers at least 2½ months prior to its own sale and the $200,000 offer had been tentatively accepted with its apparent approval. Yet, despite the fact that the auctioneer hired to conduct the sale provided an estimate—although concededly only a guesstimate—of $45,000 for the assets upon public sale, the Government, without explanation or apparent good cause, announced and proceeded with the public sale.[15]

██ And while price is not determinative, UCC § 507(2), the fact that the offers were five times greater than the proceeds realized upon the sale is at least probative on the question of commercial reasonableness. See Merchantile Financial Corp., supra at 801:

Although § 9–507(2) clearly provides that a discrepancy between a price received by a creditor disposing of assets pursuant to § 9–504 and an isolated price later shown to have been obtainable, is not alone sufficient to grant a debtor affirmative relief under § 9–507(1), certainly such a discrepancy, if substantial, is relevant to a determination of whether a challenged sale was "commercially reasonable."

In light of these facts, we conclude that the Government failed to carry its burden and that the trial court was correct in holding that the sale was commercially unreasonable.

## B. Effect of Breach

Having determined that the Government failed to carry out the duty imposed upon it by § 9–504(3), there still remains the question of the effect of this breach. The courts have differed. Some have held that failure to comply with the requirements of § 9–504(3) absolutely precludes recovery by the secured party in a subsequent action against the debtor for a deficiency. *Camden National Bank v. St. Clair,* 309 A.2d 329 (Me.1973); *Atlas Thrift Co. v. Horan,* 27 Cal.App.3d 999, 104 Cal.Rptr. 315 (1972); *Dynalectron Corp., supra. See also* 2 Gilmore, *Security Interests in Personal Property,* Par. 44.9.4, p. 1264; *Leasco Data Processing Equip. Corp. v. Atlas Shirt Co.,* 66 Misc.2d 1089, 323 N.Y.S.2d 13 (1971); *Skeels v. Universal C.I.T. Credit Corp.,* 222 F.Supp. 696 (W.D.Pa.1963) *modified on other grounds,* 335 F.2d 846 (3d Cir. 1964). This also appears to be the approach followed by Ohio courts. *Miles v. N.J. Motors, Inc.,* 44 Ohio App.2d 351, 338 N.E.2d 784 (1975). Other courts have held that failure to meet the requirements of § 9–504(3) creates a presumption that the value of the collateral equalled the indebtedness secured, thereby extinguishing the indebtedness unless the secured party rebuts the presumption. *United States v. Whitehouse Plastics* (5th

---

**15.** Gordon Miller, the SBA representative in charge of this transaction and who apparently made the decision as to the manner of sale, did not appear as a witness at the trial below.

Cir. 1974) 501 F.2d 692, *cert. denied,* 421 U.S. 912, 95 S.Ct. 1566, 43 L.Ed.2d 7; *In Re Bishop,* 482 F.2d 381 (4th Cir. 1973); *Leasing Associates, Inc. v. Slaughter & Son, Inc.,* 450 F.2d 174 (8th Cir. 1971). Still others have held that failure to comply with the requirements of § 9–504(3) places upon the debtor's shoulders a duty to prove any loss he is alleged to have sustained. *Leasco Computer, Inc. v. Sheridan Industries, Inc.,* 82 Misc.2d 897, 371 N.Y.S.2d 531 (1975); *Grant County Tractor Co. v. Nuss,* 6 Wash. App. 866, 496 P.2d 966 (1972).

In circumstances such as presented in this case, divergence in the law provides substance for federal choice. As noted already, Ohio courts appear to follow the first approach set out above. *Miles v. N.J. Motors, Inc., supra.* While we might well adopt the absolute bar rule applied by the Ohio courts, we, like the district court below, decline to do so out of our belief that the rebuttable presumption rule is the more enlightened and equitable.

Applying the rule to the facts of this case, we agree with the trial court that the Government cannot recover because it failed in its duty to rebut the presumption. The fact that two offers five times greater than the proceeds were made and that the Government's own original minimum bid requirement was $150,000 is sufficient to establish that, in all probability the assets' fair market value exceeded the price received upon actual sale. Yet, a review of the record of the trial below reveals that the Government failed to adduce any evidence tending to show that the fair market value of these assets was less than the indebtedness secured and if so, by what amount. Its entire presentation of testimonial evidence focused on establishing that the auction was properly conducted and that the sale was commercially reasonable by virtue of this fact alone.[16]

The Government correctly notes that even a secured party who fails to dispose of collateral in a commercially reasonable manner has often been held entitled to recover the difference between the outstanding debt and the fair market value of collateral. But the Government would ignore that part of the rule followed in this case that before recovery is permitted, the secured party must 1) establish the fair market value of the collateral and, thereby, 2) rebut the presumption that the value of the collateral equalled the indebtedness secured. The Government failed to do either here and thus, we agree with the trial court that it was not entitled to any recovery.

As its final argument, the Government maintains that it is entitled to a judgment for $96,530, the difference between the $296,530 outstanding debt and $200,000. It argues that since the basis of the trial court's determination that the sale was commercially unreasonable was the fact that two private offers of $200,000 and $210,000, respectively, were made by prospective purchasers prior to the public sale and that since defendants offered no evidence to show that the collateral was worth more than $200,000 it is entitled to this amount at a minimum.

This Court cannot agree. The $200,000 figure which appellant would now select to represent the fair market value of the assets was introduced at trial not to establish fair market value per se, but rather, to show that the amount received upon the actual sale was substantially less than what might have been obtained in a sale conducted in a commercially reasonable manner. The introduction of this figure to suggest the inadequacy of the price actually obtained is not proof of the assets' actual value.[17]

16. Presumably, the Government's proof on this point also encompassed the fairness—measured by fair market value—of the price actually obtained. Otherwise, the Government would have been in the anomalous position of arguing that, while the assets' fair market value greatly exceeded the price obtained, the price actually obtained was still a fair one.

17. The evidence presented at trial as to the fair market value of Opticron's assets at the time of sale was conflicting at best. Ken Miller, the auctioneer retained by the Government to conduct the sale, testified that he appraised the assets at $45,000 before conducting the sale. Upon inquiry by the district court, Miller confided that even this appraisal was a "gut reac-

In essence, the Government argues that an amount which no one contended at trial to be the fair market value of the assets should now be adopted by this Court as the fair market value of the assets. The Government surely did not contend at trial that this figure was the fair market value for it would then have been in the anomalous position of arguing that $47,456.63 was a reasonable price for the assets despite their fair market value of at least $200,000.[18]

We have adopted as the rule in this case that where the secured party has disposed of the collateral in a commercially unreasonable manner, it rests with him to carry the burden of proof in rebutting the presumption that the fair market value of the assets equalled the indebtedness secured. Had sufficient evidence been adduced at trial, whether by appellant or defendants, to establish the fair market value of the assets in question, this court would not hesitate to permit appellant any benefit that it could derive therefrom. However, the fair market value of these assets was not established by the evidence of either party at trial.

For the foregoing reasons, the judgment of the district court is affirmed, the parties to bear their own costs.

tion," a mere "guess" or "guesstimate." In the notice placed in the Business Opportunity Section of the Sunday Cleveland Plain Dealer on February 18, 1973, advertising a summary public auction sale of the assets to be held on Tuesday, February 22, 1973, five days later, appellant included a minimum bid requirement of $150,000. Plaintiff, on its behalf, adduced evidence at trial of two firm private offers to purchase the assets for $200,000 and $210,000 respectively. Mr. Willis' testimony suggested a market value of the assets of up to $240,000.

18. *See* note 16, *supra.*