RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0135p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

DOUG GOODMAN,

*Plaintiff-Appellant*,

No. 22-5238

*v.*

COMMERCIAL BANK AND TRUST COMPANY,

*Defendant-Appellee*.

─────────────────

Appeal from the United States District Court for the Western District of Tennessee at Jackson.
No. 1:21-cv-01003—S. Thomas Anderson, District Judge.

Argued: January 11, 2023

Decided and Filed: June 26, 2023

Before: KETHLEDGE, READLER, and MURPHY, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:** William Lewis Jenkins Jr., JENKINS, DEDMON, AND HAYES LAW GROUP LLP, Dyersburg, Tennessee, for Appellant. Walter Preston Battle, IV, BAKER DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC, Memphis, Tennessee, for Appellee. **ON BRIEF:** William Lewis Jenkins Jr., JENKINS, DEDMON, AND HAYES LAW GROUP LLP, Dyersburg, Tennessee, for Appellant. Walter Preston Battle, IV, BAKER DONELSON, BEARMAN, CALDWELL & BERKOWITZ, PC, Memphis, Tennessee, for Appellee.

─────────────────

## OPINION

─────────────────

CHAD A. READLER, Circuit Judge. Under Tennessee's version of the Uniform Commercial Code, when is a bank entitled to a remedy (here, restitution) from a payee for mistakenly paying a negotiable instrument (here, a check)? And when does a payee take a check

in "good faith" and "for value," enabling the payee to defend against a payor bank's claim for restitution?  Those questions are posed here, as they were before the district court.  At summary judgment, the district court held that two checks cashed at Commercial Bank and Trust were paid to Doug Goodman by "mistake" within the meaning of Tenn. Code Ann. § 47-3-418(b), and that Goodman could not demonstrate that he took the checks in good faith and for value, *see id.* § 47-3-418(c), entitling the Bank to restitution.  We agree and thus affirm.

**I.**

At heart a dispute over how to interpret Tennessee's version of the Uniform Commercial Code, this suit has its origins in a crop insurance contract issued to farmer Doug Goodman.  The story begins with Goodman contacting Doug Martinek, of Southern Risk Insurance Group, Inc., to obtain crop insurance for a Missouri farm Goodman owned.  Through Martinek, Southern Risk assisted Goodman in obtaining a policy from an insurance company.

Later that year, Goodman discovered that certain portions of his Missouri property could not be farmed due to excess moisture.  Goodman filed a claim under the policy.  But the insurer denied the claim as beyond the scope of the policy.

Frustrated, Goodman accused Martinek and Southern Risk of failing to obtain proper coverage.  Martinek and Goodman discussed the matter.  Although no formal resolution appears to have been reached, Martinek did provide Goodman with two checks drawn from Southern Risk's account at Commercial Bank and Trust Company.  One was for $100,000, the other $200,000.  At the time the checks were written, however, Southern Risk's account had insufficient funds to cover the draws.

According to Martinek, he wrote these checks due to a perceived moral obligation to Goodman.  Goodman, for his part, testified that he gave Martinek nothing in consideration for the checks.  For instance, Goodman disclaimed that the checks were given to avoid litigation between the parties, as he testified that he never discussed a lawsuit with Martinek for failing to obtain proper crop insurance**.**

Goodman attempted to cash the checks at Commercial Bank, not once, but twice. On both occasions, Goodman was turned away after being told that Southern Risk's account was unable to support the draws. Goodman and Martinek discussed how funds could be raised to cover the withdrawal. No proposed solution, it seems, came to fruition.

A few months later, frustrated with the delay, Goodman texted Martinek, asking to meet with him that morning. Martinek deduced that Goodman wanted to discuss the uncashed checks. Martinek texted Goodman to say that he was "waiting on the funds" and "waiting for everything to go through," and that he did not then have the money to cover the checks. Martinek indicated that he hoped to have the funds "by lunch." Early that afternoon, Goodman texted Martinek again to ask, "[a]nything on the funds[?]" Martinek responded that he was "[s]till waiting." A short time later, Martinek texted that the "funds may get here today." Martinek texted once more, however, to say that he had "everything stopped." Goodman did not respond.

Instead, Goodman arrived at Commercial Bank with the two Southern Risk checks. According to Goodman, he was already on his way to the bank when Martinek sent his "everything stopped" message. Goodman asked the bank teller for two "cashier's checks" in exchange for the Southern Risk checks. He did not mention his past attempts to negotiate the checks. Feeling "rushed" during the transaction, the teller did not check the balance in Southern Risk's account before issuing the checks. She printed two official "teller's checks" payable to Goodman in the amounts of $100,000 and $200,000, respectively. Shortly after Goodman left the bank, the teller reviewed Southern Risk's account. When the teller realized the account lacked sufficient funds to cover the checks, the Bank issued a stop payment order.

That brought things to a head. Invoking federal diversity jurisdiction, Goodman sued Commercial Bank to enforce the teller's checks. The Bank counterclaimed for restitution. Resolution of their dispute turned on the proper interpretation of Tennessee's Commercial Code, which largely tracks the Uniform Commercial Code (U.C.C.). At issue was whether Commercial Bank paid out the Southern Risk checks by "mistake," Tenn. Code Ann. § 47-3-418(b), and, if so, whether Goodman had taken those checks in "good faith" and "for value," *id.* § 47-3-418(c), which would mean the Bank was not entitled to restitution for its "mistake." The district court understood Tennessee's Commercial Code to define a mistake as "a state of mind

not in accord with the facts." Utilizing that standard, the district court, at summary judgment, held that Commercial Bank paid the Southern Risk checks to Goodman by mistake and that Goodman did not give value for them. Accordingly, the court granted summary judgment to Commercial Bank on its claim for restitution. Goodman's timely appeal is now before us for resolution.

## II.

We review the district court's summary judgment decision de novo. *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 593 (6th Cir. 2007); *El-Khalil v. Oakwood Healthcare, Inc.*, 23 F.4th 633, 634 (6th Cir. 2022). In that respect, we ask the same question as did the district court: have the parties adduced sufficient facts such that a jury, after being instructed on the law, could reasonably rule for either of them? *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "If not, the case should not go to a jury because a reasonable jury could reach only one verdict." *Lemon v. Norfolk S. Ry. Co.*, 958 F.3d 417, 419 (6th Cir. 2020).

The Uniform Commercial Code sets today's legal stage. What is the U.C.C.? Generally speaking, it is a set of model rules governing commercial dealings, with the twin aims of providing efficiency and uniformity. Through a series of policy decisions, the U.C.C.'s drafters calibrated legal conventions believed to best serve parties negotiating commercial transactions. *United States v. Willis*, 593 F.2d 247, 253 (6th Cir. 1979) (noting that the U.C.C. "is the culmination of years of exhaustive study and effort, the purpose of which was to simplify, clarify, modernize and make uniform the laws of various jurisdictions concerning commercial practices and transactions"). Those model rules, if adopted by the states, would bring uniformity to the legal landscape of commercial transactions. *Id.* By and large that has been the case—most states have modeled their commercial codes after the U.C.C. *See* Michael D. Sabbath, *UCC Update: Revised Articles 3 and 4*, 48 Mercer L. Rev. 83, 83 (1996). That includes Tennessee, *see* Tenn. Code Ann. § 47-1-101, which crafted its Commercial Code in line with the model U.C.C. Virginia Wilson, *The Law of Negotiable Instruments, Bank Deposits, and Collections in Tennessee: A Survey of Changes in the 1990 Revisions to UCC Articles 3 and 4*, 28 U. Mem. L. Rev. 117, 118 (1997). With the U.C.C. serving as a template, the Tennessee legislature drafted a series of commercial laws to "simplify, clarify, and modernize law

governing commercial transactions," as well as to "permit the continued expansion of commercial practices through custom, usage, and agreement of the parties." *See* Tenn. Code Ann. § 47-1-103(a); *Auto Credit of Nashville v. Wimmer*, 231 S.W.3d 896, 902 (Tenn. 2007) ("The Uniform Commercial Code . . . has as its purpose to provide a simple and unified structure within which the immense variety of present-day . . . transactions can go forward with less cost and with greatest certainty." (quotation and citation omitted)).

As the U.C.C.'s drafters seemingly anticipated, the flurry of day-to-day commercial transactions across the country sometimes results in parties to those transactions making mistakes in their dealings. How to resolve those mistakes, one might imagine, could easily spark debate, if not outright disagreement. To provide a uniform legal framework for resolving those disputes in an efficient manner, the U.C.C. sets out rules for assessing which party to a transaction should bear the costs attributable to the mistake. The rules vary depending on the nature of the transaction. *Compare* U.C.C. § 2-209 (Am. L. Inst. & Unif. L. Comm'n) (remedies for error in a contract governed by U.C.C. Article 2), *with id.* § 3-418 (discussing mistaken payment of a negotiable instrument under U.C.C. Article 3); *and id.* § 9-506 (addressing mistakes in certain secured transactions under U.C.C. Article 9). At issue here is Article 3—payment of a negotiable instrument. *See id.* § 3-104 (a check is a negotiable instrument).

With respect to Article 3, Tennessee has largely followed the U.C.C.'s lead. Chapter Three of the Tennessee Commercial Code governs negotiable instruments. *See* Tenn. Code Ann. § 47-3-101. Like Article 3 of the U.C.C., Tenn. Code Ann. § 47-3-104 instructs that checks are negotiable instruments. Under the Chapter's negotiable instruments rules, Part Four allocates the liability of parties. *Id.* §§ 47-3-401 to -420. Section 18 of that part specifically governs how to allocate loss for negotiable instruments paid by "mistake." *Id.* § 47-3-418. When "an instrument has been paid" "by mistake," Tennessee law explains, the payor "may, to the extent permitted by the law governing mistake and restitution, (i) recover the payment from the person to whom or for whose benefit payment was made." *Id.* § 47-3-418(b). The right to restitution for an instrument paid, however, is not unlimited. For example, the remedies available under § 47-3-418(b) "may not be asserted against a person who took the instrument in good faith and for value." *Id.* § 47-3-418(c). In the context of the "nationwide check system," these rules together

aim to "facilitate, and not hamper, [that] system in functioning at maximum efficiency for the benefit of all its users and in minimizing financial institution risk." Fred H. Miller, *U.C.C. Articles 3, 4 and 4A.: A Study in Process and Scope*, 42 Ala. L. Rev. 405, 414 (1991) (discussing the policies animating Article 3 of the U.C.C.).

This statutory framework serves as the legal backdrop for answering the following question: when is a bank entitled to restitution from a payee when it pays an instrument to the payee drawn on an account with insufficient funds? The "instruments" at issue here are the Southern Risk checks, which Commercial Bank "paid" through its issuance of the teller's checks. *See* Tenn. Code Ann. § 47-3-418(b). The threshold inquiry in answering that question is whether Commercial Bank "paid" Goodman by "mistake." *Id.* If it did, the next inquiry is whether Goodman took the "instruments" (Southern Risk checks) in "good faith" and "for value." *Id.* § 47-3-418(c). If Goodman did not do so, then Commercial Bank is entitled to restitution.

*Mistake.* Section 47-3-418(b) of the Tennessee Commercial Code explains that to "the extent permitted by the law governing mistake and restitution," a party may recover for mistaken payments. *Id.* § 47-3-418(b). Mistakes, however, come in many shapes and sizes. And the statute does not define what manner of mistake entitles a payor to restitution.

Helpful here is the "official commentary" accompanying the statute. Ordinarily, our statutory analysis begins and ends with a statute's text. *See BedRoc Ltd. v. United States*, 541 U.S. 176, 183 (2004); *Whirlpool Fin. Corp. v. Comm'r of Internal Revenue*, 19 F.4th 944, 950 (6th Cir. 2021); *United States v. Hill*, 963 F.3d 528, 532 (6th Cir. 2020). For purposes of interpreting the text of Tennessee's Commercial Code, however, Tennessee courts follow the statutory instruction that the companion official commentary "shall constitute evidence of the purposes and policies underlying" the statute "[i]n any dispute as to the proper construction" of the statute. Tenn. Code Ann. § 47-1-103(c); *Auto Credit of Nashville*, 231 S.W.3d at 900–03 (looking to the official comments to resolve a Tennessee Commercial Code interpretation question).

The commentary accompanying § 47-3-418(b) provides illustrative examples of the types of mistakes entitled to be remedied by restitution. Tenn. Code Ann. § 47-3-418 cmt. 3. One of those examples, from Comment 3, is particularly illustrative. It explains that the "mistake" provision in § 47-3-418(b) applies to instances where, like here, the drawee bank "has no duty to the drawer to pay . . . because available funds in the drawer's account are not sufficient to cover the amount of the check." *Id.* "[I]f the bank paid because of a mistaken belief that there were available funds in the drawer's account sufficient to cover the amount of the check," Comment 3 makes clear, "the bank is entitled to restitution." *Id.* Comment 3 also cross-references the Restatement (First) of Restitution § 29. *Id.* And § 29 of the Restatement of Restitution, in turn, explains that one "who, because of a mistake of fact, has paid money to another in the payment or the purchase of a bill of exchange or promissory note, is entitled to restitution in accordance with the rules stated in [Restatement (First) of Restitution] §§ 6–28." Restatement (First) of Restitution § 29 (Am. L. Inst. 1937). The cross-referenced portions of the Restatement define "mistake" to mean "a state of mind not in accord with the facts," and a "mistake of fact" as "any mistake except a mistake of law." *Id.* §§ 6, 7.

Guided by these principles of mistake and restitution, a bank paying a check on the erroneous belief that the underlying account contained sufficient funds constitutes the type of mistake eligible to be remediated by restitution. That aptly describes the situation here. The record reflects that Commercial Bank's teller felt "rushed" and was "working under the assumption that the funds were available," an assumption that was "not in accord with the facts." This circumstance, in fact, largely mirrors an instance described in Comment 3. There, the Code's drafters offered the following example of a "clear" case when restitution would be required. Tenn. Code Ann. § 47-3-418 cmt. 3. In the example, a "Father gives Daughter a check for $10,000 as a birthday gift. The check is drawn on Bank in which both Father and Daughter have accounts." *Id.* And upon receiving the check, the "Daughter deposits [it] in her account in Bank." *Id.* From there, a mistake of fact like the one here unfolds:

> An employee of Bank, acting under the belief that there were available funds in Father's account to cover the check, caused Daughter's account to be credited for $10,000. In fact, Father's account was overdrawn and Father did not have overdraft privileges. Since Daughter received the check gratuitously there is clear

> unjust enrichment if she is allowed to keep the $10,000 and Bank is unable to obtain reimbursement from Father.

*Id.* As the Comment indicates, this is a "clear" case in which the bank would be entitled to "the remedy of restitution." *Id.* And those facts, it is easy to see, bear distinct similarities to this case. A "mistake of fact" by the teller occurred, meaning Goodman was not entitled to payment on the Southern Risk checks he attempted to cash.

Goodman offers a different view. To begin, he says there is no evidence as to why the teller felt rushed or assumed the funds were available to cover the checks Goodman presented. True, the teller did not explain the basis for her apparent expectation that the funds were in the account. But the statute does not require an explanation for the payor's mistake of fact. Return to the Father/Daughter example; the bank there was entitled to restitution where its employee was "acting under the belief that there were available funds" without any assessment of whether that belief was reasonable or her actions were negligent. *Id.*

Even then, Goodman contends, an assumption is not a belief, and thus not a "mistake of fact." For purposes of § 47-3-418(b), however, we see no meaningful distinction between the two. Indeed, we said as much in *National Savings & Trust Co. v. Park Corp.*, 722 F.2d 1303 (6th Cir. 1983). Interpreting a nearly identical provision of the Ohio Commercial Code, we held that a bank was entitled to restitution for a "mistaken" payment drawn from an account with insufficient funds when the two employees responsible for checking the account balance "assumed" the other had done so. *Id.* at 1304–05.

That leaves Goodman's argument that Commercial Bank acted either willfully or with gross negligence, and thus did not exercise due care, disqualifying the Bank from any entitlement to restitution. Where does Goodman locate his due care requirement? Not in the text of § 47-3-418(b); it contains no negligence exception. Tenn. Code Ann. § 47-3-418(b). Nor in the statute's Comments or the incorporated portion of the Restatement, neither of which requires a payor's mistaken belief to be reasonable. *Id.* at cmt. 3; Restatement (First) of Restitution §§ 6, 7. Instead, Goodman turns to cases addressing Tennessee common law contract rescission and equitable remedies. But those common law contract cases offer little guidance here. None of them, after all, are governed by Tennessee's adoption of U.C.C. Article 3 and its statutory

framework for assessing when restitution is appropriate due to a mistakenly paid negotiable instrument. *C-Wood Lumber Co. v. Wayne Cnty. Bank*, 233 S.W.3d 263, 281 (Tenn. Ct. App. 2007) ("The weight of the case law comes down against permitting common-law actions to displace the UCC's provisions regarding transactions governed by Articles 3 and 4."); *see also Queen City Pastry, LLC v. Bakery Tech. Enters., LLC*, No. M2017-00112-COA-R3-CV, 2018 WL 3854912, at *4 n.3 (Tenn. Ct. App. Aug. 14, 2018) (noting that Tennessee's adoption of U.C.C. Articles 3 and 4 displaces common law causes of action "governing the endorsement, negotiation, collection, and payment of checks" (citation omitted)).

The lone negotiable instrument case Goodman points to is from New Jersey. *Demos v. Lyons*, 376 A.2d 1352, 1357–58 (N.J. Super. Ct. Law Div. 1977). Yet the situation there is unlike the one here. The bank in *Demos* intentionally chose to extend credit to a customer who did not have sufficient funds in his account to cover a check so as not to embarrass the customer. *Id.* at 1355. To be sure, "an improvident extension of credit" may not entitle a bank to restitution for future loss. *Id.* at 1357. But Commercial Bank's teller did not choose to extend credit to Martinek—she merely assumed (incorrectly) that Southern Risk's account had sufficient funds to cover the checks. At day's end, the teller made a "mistake of fact." And under Tennessee law, that is enough to make Commercial Bank eligible for restitution. Tenn. Code Ann. § 47-3-418(b).

*For Value.* Even with Commercial Bank's mistake qualifying for restitution under Tennessee's Commercial Code, Goodman would not be obligated to pay restitution if he took the Southern Risk checks "in good faith and for value." *Id.* § 47-3-418(c). Commercial Bank argues that the checks were taken neither in good faith nor for value. We need only address the latter.

Tennessee's Commercial Code provides that an instrument is "issued or transferred for value" if:

> (1) the instrument is issued or transferred for a promise of performance, to the extent the promise has been performed;
>
> (2) the transferee acquires a security interest or other lien in the instrument other than a lien obtained by judicial proceeding;
>
> (3) the instrument is issued or transferred as payment of, or as security for, an antecedent claim against any person, whether or not the claim is due;

(4) the instrument is issued or transferred in exchange for a negotiable instrument; or

(5) the instrument is issued or transferred in exchange for the incurring of an irrevocable obligation to a third party by the person taking the instrument.

Tenn. Code Ann. § 47-3-303(a). None of these circumstances are present here. The most relevant subsection appears to be § 47-3-303(a)(3), which provides that payment of "an antecedent claim" is a transfer "for value." *Id.* Conversely, "[a] moral obligation alone is not a sufficient consideration to sustain a promise." *Evans, Fite, Porter & Co. v. Bell*, 83 Tenn. 569, 572 (1885); *see also* Tenn. Code Ann. § 47-3-418 cmt. 3 ("Since Daughter received the check gratuitously there is clear unjust enrichment if she is allowed to keep the $10,000 and Bank is unable to obtain reimbursement from Father.").

The record reflects that Martinek gave the checks to Goodman because he felt "morally obligated to help" him, not in exchange for a release of claims by Goodman. Indeed, Martinek testified that Goodman never gave Martinek anything in return for these payments. Goodman, at his deposition, testified that he and Martinek never discussed a claim or potential lawsuit when he received the checks from Martinek. Even after Martinek took his time in paying him, in fact, Goodman never threatened to sue Martinek.

Goodman answers by highlighting his response to Commercial Bank's summary judgment motion. There Goodman attached a declaration indicating that he gave up a "claim for negligence against" Martinek when they made an "agreement for the payment of what would have been received had the correct crop insurance policy been obtained." That belated statement, however, conflicts with Goodman's earlier sworn deposition testimony. Yet it is well understood that a "party cannot create a genuine issue of material fact by filing an affidavit, after a motion for summary judgment has been made, that essentially contradicts his earlier deposition testimony." *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 906 (6th Cir. 2006) (quoting *Penny v. United Parcel Servs.*, 128 F.3d 408, 415 (6th Cir. 1997)); *see also Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986) (same).

At day's end, Goodman did not take the Southern Risk checks "for value." They were nothing more than a gratuitous gift. And as Goodman failed to satisfy Tenn. Code Ann. § 47-3-418(c)'s "for value" requirement, Commercial Bank is entitled to restitution.

\* \* \* \* \*

We affirm the judgment of the district court.