**NATIONAL CREDIT UNION ADMINISTRATION BOARD, as Liquidating Agent for Center Place Credit Union,** Plaintiff,

v.

**S. Turner ALLEN, et al., Defendants.**

**No. 85–1083–CV–W–6.**

United States District Court,
W.D. Missouri, W.D.

March 16, 1989.

Gary H. Feder, Ziercher–Hocker, St. Louis, Mo., and David R. Frensley, Frensley Towerman & Willis, Kansas City, Mo., for plaintiff.

Patrick K. McMonigle and Janet I. Blauvelt, Dysart Taylor Penner Lay & Lewandowski, Kansas City, Mo., for Chelton S. Feeny and Balanced Sec. Corp. of America.

I.F.S. Inc., pro se.

## MEMORANDUM AND ORDER

SACHS, District Judge.

This debt collection case filed against numerous defendants has been disposed of without trial, except as to defendants Dr. Chelton S. Feeny, Balanced Security Corporation of America ("Balanced Security") and I.F.S. Incorporated ("IFS"). Plaintiff's claims as to the named defendants were tried to the court on February 13, 1989. Counsel for IFS was permitted to withdraw and IFS appears pro se, with the understanding that it has no funds to defend itself. Basic findings of fact proposed by plaintiff are adopted by way of introduction to the contested issues, as modified to conform to responses by Dr. Feeny and Balanced Security and limited changes by the court. Findings are made as follows:

1. The National Credit Union Administration is an agency of the United States Government and regulates and insures federally insured credit unions throughout the United States. Plaintiff, the National Credit Union Administration Board ("NCUAB"), pursuant to 12 U.S.C. § 1752a, manages said agency.

2. The original defendants in this matter were S. Turner Allen; Kenton L. Stanger; Reed H. Neilson; Dale C. Tinstman; Chelton S. Feeny; I.F.S. Incorporated, a Utah corporation; Diamond Life Insurance Company, an Arizona corporation; and Balanced Security Corporation of America, a Utah corporation. S. Turner Allen and spouse filed for bankruptcy, and a Discharge of Debtor was entered on January 27, 1987. Kenton Stanger and spouse filed for bankruptcy, and a Discharge of Debtor was entered on August 1, 1988. Reed H. Neilson and spouse filed for bankruptcy, and a Discharge of Debtor was entered on July 27, 1988. Defendants Stanger and Neilson were dismissed from this action by order of court dated October 14, 1988. Plaintiff and Dale C. Tinstman entered into a Settlement Agreement and, by court order dated January 12, 1987, the various claims between plaintiff and Tinstman were dismissed. IFS filed for Chapter 11 bankruptcy on March 7, 1986, but said bankruptcy filing was dismissed by order

of the bankruptcy court on May 25, 1988, and said bankruptcy was neither converted to a Chapter 7 nor otherwise refiled by IFS. IFS Data Systems, Incorporated, a Nebraska corporation and wholly owned subsidiary of IFS, was substituted as a party defendant for Diamond Life Insurance Company. Defendant Feeny is a resident of Utah.

3. Center Place Credit Union was a federally insured credit union with its principal place of business in Independence, Missouri ("Center Place"). The offices of Center Place were located in the Western Division of the United States District Court for the Western District of Missouri.

4. On July 8, 1985, Center Place was found to be insolvent and placed into involuntary liquidation pursuant to 12 U.S.C. §§ 1766(d) and 1787(a)(1). The NCUAB, pursuant to 12 U.S.C. § 1787(a)(1), became Liquidating Agent for Center Place.

5. Among the files of Center Place at the time of involuntary liquidation were loan files concerning the defendants herein. Plaintiff NCUAB, because of its Liquidating Agent status, became the proper party to seek collection of loans and is the real party in interest to seek legal enforcement of said loans.

6. On or about July 8, 1983, defendant Feeny, et al., signed and delivered to Center Place eight (8) promissory notes payable to Center Place incorporating by reference Attachments A, B, and C thereto which were made a part thereof. Copies of said notes (without attachments) were attached to Plaintiff's First Amended Complaint as Exhibit A—Exhibit H. The face amount of the Feeny note was $400,000, and the face amount of the Balanced Security note was $450,000.

7. On or about July 8, 1983, defendant IFS and others, not including defendants Feeny and Balanced Security, signed and delivered to Center Place a Pledge and Security Agreement and a Guaranty. Said documents served as Attachment B and Attachment C, respectively, to each of the eight (8) promissory notes. Copies of said documents were attached to Plaintiff's

First Amended Complaint as Exhibits J and K.

8. The eight (8) promissory notes, Pledge and Security Agreement and Guaranty were part of a larger transaction in the sum of $3,500,000 stated in the Pledge and Security Agreement to be for the benefit of IFS and to enable IFS to purchase controlling shares of stock of Service Life Insurance Company ("Service Life").

9. Defendant Feeny's promissory note required that principal and interest be paid to Center Place in accordance with the promissory note he executed and with Item 5 of Attachment A to said promissory note. A copy of said Attachment A was attached to Plaintiff's First Amended Complaint as Exhibit I.

10. On July 8, 1983, Kenton L. Stanger and Reed H. Neilson were officers, directors and shareholders of defendant IFS. Defendant Feeny was a director and shareholder of defendant IFS, and defendant Balanced Security was, in part, owned by defendant IFS.

11. Proceeds from the Center Place loan transaction were used to purchase stock in Service Life, and said Service Life stock was pledged by IFS to Center Place as part of the loan collateral.

12. On July 2, 1985, Center Place declared the eight (8) notes in default and the remaining balance immediately due and payable.

13. Defendants have not paid the remaining balance of the loan as demanded by plaintiff.

14. The loan documents provide for payment by defendants of plaintiff's attorney's fees and costs of collection in the event of default and legitimately collectible deficiencies.

15. By letter dated July 12, 1985, plaintiff notified IFS that it would commence efforts on August 19, 1985, to sell Certificate No. 6121, comprising 104,021 shares of Service Life stock and Certificate No. 6186, comprising 17,133 shares of Service Life stock. The letter did not purport to notify all defendants and did not refer to 6,103 additional shares that had also been pledged.

16. On November 14, 1985, all the pledged Service Life shares of stock were registered in plaintiff's name at plaintiff's request.

17. Plaintiff contracted, paid for and received an actuarial appraisal of Service Life Insurance Company prepared by Larry Baber of the Actuarial firm of Milliman and Robertson, Inc., dated December 6, 1985.

18. Plaintiff, through various contacts with, among others, the Department of Insurance of the State of Nebraska and the existing management of Service Life, sought to locate a potential purchaser of the Service Life shares of stock. Defendants Feeny and Balanced Security question the adequacy of the search.

19. On December 5, 1985, plaintiff notified counsel of record for defendants Feeny, IFS, et al., in writing, of the time (Friday, December 13, 1985) after which sale of the shares of common stock of Service Life would be made by plaintiff. On December 12, 1985, by similar notification, the earliest sales date was extended to December 20, 1985.

20. Plaintiff received a limited number of written and oral offers for the purchase of the Service Life stock.

21. The highest price offered in writing by potential purchaser Pioneer Life was $2.3 million in cash for 127,257 shares of Service Life common stock and $400,000.00 in cash for surplus notes subject to satisfaction of certain conditions imposed by Pioneer Life.

22. On January 29, 1986, plaintiff entered into a written contract to sell to Ellsworth Financial Corp. 127,257 shares of Service Life common stock for a price of $2,150,000.00 in cash. $450,000.00 in cash for surplus notes was also received from Ellsworth.

23. On March 24, 1986, plaintiff NCUAB concluded its sale to Ellsworth Financial Corp. of 127,257 shares of Service Life common stock for $2,150,000.00 in cash and the sale of surplus notes to Ells-

worth Financial Corp. for $450,000.00 in cash.

24. Proceeds from the sale of the Service Life common stock have been applied against the original indebtedness to Center Place totaling $3.5 million as have proceeds from collection of letters of credit and other collateral, together with the settlement payment received from Dale Tinstman. There remains, however, a total indebtedness as of February 13, 1989, of $1,473,-318.00, including principal, interest and claimed costs of collection.

25. Of said total indebtedness, defendant Feeny is allegedly liable for the sum of $400,000.00 plus interest to date plus claimed costs of collection, being the total amount of $774,618.50.

26. Of said total indebtedness, Balanced Security Corporation is allegedly liable for the sum of $400,000.00 plus interest to date plus claimed costs of collection, being the total amount of $774,618.50.

27. Of said total indebtedness, IFS is allegedly liable for the amount of $1,491,-318.20.

Additional findings are incorporated in the analysis of the remaining controversies which include (a) whether required statutory notice of sale was given to defendants Feeny and Balanced Security, (b) whether plaintiff made commercially reasonable efforts to obtain the highest price for the collateral, and (c) how much defendants Feeny and Balanced Security were originally obligated to repay and how any deficiency should be assessed.

## I.

■ The parties agree that plaintiff, intending a private sale of the collateral, was required by law to give debtors "reasonable notification of the time after which any private sale or other intended disposition is to be made...." Section 400.9–504(3), RSMo. The written notice to IFS was inadequate in failing to include each of the alleged debtors and in omitting mention of some of the collateral. The claim for a deficiency depends, therefore, on the sufficiency of notification by letter to counsel of

record for defendants in this litigation. A further review of pertinent facts is appropriate.

The complaint in this case was filed on August 30, 1985. On September 27, 1985, a stipulation was filed by plaintiff's counsel and attorney Laurence R. Tucker of Kansas City, purporting to act for defendants Feeny and Balanced Security, extending defendants' response time to October 14, 1985. The court so ordered on October 1, 1985. On October 15, 1985, defendants Feeny and Balanced Security, purportedly acting pro se, filed for an additional extension of time of 30 days reciting that they were attempting to obtain counsel and that they were also engaged in settlement negotiations. This request for time was opposed, and the court granted the pertinent defendants until November 4, 1985, to respond to the complaint. John B. Maycock of Salt Lake City, purporting to act as attorney for the pertinent defendants, joined with plaintiff's counsel on October 21, 1985, in a stipulation to extend time to respond. On November 4, 1985, Maycock filed a further pleading purportedly on behalf of defendants, individually named and also described collectively as "IFS Group," agreeing to an amended complaint and agreeing to respond by November 25. The November 4 filing (Doc. 20) further recites that "Prior to December 4, 1985, plaintiff shall not sell ... any shares of stock held as collateral for the obligations which are the subject matter of the action without giving ten days prior written notice to the IFS Group."

By letter to Maycock dated December 5, 1985 (P.Exh. 12), plaintiff's counsel Feder stated that "NCUAB would not sell and convey any shares of common stock of Service Life Insurance Company prior to Friday, December 13, 1985." On December 12, 1985 (P.Exh. 13), a similar notice was given, agreeing not to sell the collateral prior to Friday, December 20, 1985. No further extensions or notices are in the record. By answer and counterclaim filed December 24, 1985, Maycock, purportedly acting as attorney for Feeny, Balanced Security and other defendants, recited, among other things, that "plaintiff has in-

formed defendants that plaintiff intends to sell or transfer the stock pledged as collateral ... immediately and without further notice...." An injunction restraining the sale was sought in pleading but not further pressed in this litigation.

The first indication that defendant Feeny was seeking counsel other than Maycock occurred on August 4, 1986, when present counsel entered his appearance on behalf of Feeny, Balanced Security and two other defendants. There is nothing of record prior to immediate pre-trial filings showing an objection to Maycock's prior representation or his actions. At trial, however, Dr. Feeny testified that he paid no fees to Maycock, never agreed to pay for his services, and did not consider Maycock to be his attorney.

If Maycock properly acted as attorney for defendants Feeny and Balanced Security in this litigation there is no contention that they did not receive appropriate written notification through counsel of the intended sale of collateral.[1] If Maycock was not their attorney, however, no such written notification was given, as required by statute.

Unlike some other agency relationships, there is a "strong presumption" that attorneys who file pleadings in court have authority to do so, and are in fact attorneys for the parties named. *Colla v. Colla,* 614 S.W.2d 9, 11 (Mo.App.1981); *Schwarze v. May Department Stores,* 360 S.W.2d 336, 339 (Mo.App.1962). Despite defendant Feeny's denial in this case, made in somewhat guarded language, I find that Maycock was his authorized representative, although the arrangements may have been casual and indirect. It is entirely unlikely that a reasonably sophisticated investor, facing suit for hundreds of thousands of dollars (or more) would neglect to make arrangements for counsel for eleven months after suit is filed. On the contrary, it is almost certain that Dr. Feeny received assurances that he would be represented

by Maycock, then apparently acting as corporate counsel, and welcomed those assurances. Shortly before the entry of appearance, in a signed filing with the court, Dr. Feeny stated he was seeking counsel. The presumptions, common sense and Dr. Feeny's unconvincing testimony on this subject all point toward Maycock's temporary service during the critical period, and I so find. Adequate written notice of intent to sell the collateral was therefore given.

## II.

■ A more difficult problem is whether plaintiff's efforts to sell the stock held as collateral should be approved as being "commercially reasonable," as required by statute for parties seeking a deficiency judgment. Section 400.9–504(3), RSMo. Defendants justifiably criticize some aspects of the sales effort. Plaintiff's agent, Ravine, had training in accounting and business administration, but no experience in selling the controlling stock interest in an insurance company, or any other business for that matter. He had some limited experience in selling other collateral. He consulted with Nebraska insurance regulators, with the former owner of the company who had resumed management responsibilities, and with his superiors (not shown to be experienced in disposing of similar collateral). He obtained an appraisal, but ultimately sold for a somewhat reduced price. His efforts to seek interested purchasers were not extensive. No advertising was done, which was explained in terms of not wanting to depress the price. Ravine seems to have relied on casual conversations and inquiries by the Nebraska regulators and the former owner of the company for producing potential buyers. Defendants particularly object to plaintiff's failure to pursue a potential buyer which repeatedly expressed strong interest and which made a contingent offer that appeared to be several hundred thousand dollars above that of the ultimate purchaser.

1. While the court believes that written notice to counsel is legally adequate, and there seems to be no argument to the contrary, assuming the contested attorney-client relationship, it would doubtless have been better practice to send written notice to defendants personally as well as counsel.

Defendants' principal contention is that plaintiff unjustifiably rejected a higher written offer of $2,300,000 for the Service Life common stock from Pioneer Life Insurance Company of Illinois in favor of a $2,150,000 offer from Ellsworth Financial Corporation.[2] Plaintiff's basic reason for preferring Ellsworth over Pioneer was noted on the Pioneer offer of January 15, 1986, as follows: "Since does not exceed clean proposal from Ellsworth went with Ellsworth proposal plus use Pioneer as Fall Back." The note, dated January 19, 1986, was initialed by Ravine's supervisor, H. Allen Carver, Regional Director, NCUA. D.Exh. 6.

Ravine had previously been informed by Nebraska authorities that there would be a year-end write-down of Service Life assets by some $300,000, a fact known to Ellsworth but not Pioneer. Pioneer's offer was conditioned on "verification of assets and surplus having a value of not less than that reported in Service Life's quarterly statement of September 30, 1985...." Peter W. Nauert of Pioneer, who is resentful of his treatment by NCUAB and asserts a higher price could have been obtained, acknowledges that the condition could be read as a threat to reduce the offer (or withdraw from negotiations) if the September 30, 1985, statement of assets were to be reduced. Nauert Dep. p. 31. Carver's preference of Ellsworth over Pioneer was thus justifiable if probably mistaken. A telephone call to Pioneer could probably have helped solidify the potentially higher offer; further confirmation in writing would reasonably have been required.

A factor in the decision of Ravine and probably Carver was a sense of uncertainty over Service Life's immediate future. The former owner's age and health troubled Ravine, who was dependent on him for management. One prospective buyer's death in December 1985 apparently caused Ravine to be sensitive to life's hazards. Nauert states that Service Life was subject to "horrible working conditions" because of "inadequate management staff, inadequate systems (and) poor morale of the people...." Nauert Dep. p. 10. As a prospective buyer he hoped that his organization could "turn it around and make it very profitable very quick." Ravine, representing the current majority stock interest, could reasonably have viewed the situation as requiring the earliest feasible sale.

The sales price of the stock was somewhat below the appraised value as of September 30, 1985. Including an estimate for good will, the appraised value of a three-fourths interest was at least three million dollars. P.Exh. 11. I do not consider the appraisal helpful to either side in this controversy. Viewed in hindsight, the Ellsworth purchase price was probably less than was obtainable from Pioneer or from some other purchaser, if plaintiff could have held the company together for additional weeks or months of negotiations. I am unable to conclude, however, that plaintiff's conduct in selling to Ellsworth violated its legal duty to act in a "commercially reasonable" manner.

The range of reasonableness must be generously viewed when a creditor acts in good faith in selling collateral, after notice to a debtor. For example, under many circumstances auctions of tangible assets are authorized, even though an auction may generally bring fewer proceeds than a fully developed sales campaign and a course of individualized negotiations with prospective buyers. *Compare, United States v. Willis*, 593 F.2d 247, 258–9 (6th Cir.1979) (public sale unreasonable where expected price was only one-fifth of two outstanding offers). A creditor forced to rely on collateral to collect its debt may act in a practical manner, given all the circumstances known to it. While I join defendants in concluding as of today that plaintiff would probably have realized more if it had been less eager to make a sale and more skillful in seeking prospects and in bargaining, I do not believe the sale that

---

**2.** There was also apparently a $30,000 higher oral offer by Pioneer before submitting the written offer and a stream of telephone calls and correspondence indicating Pioneer's strong in- terest in purchasing the stock. Pioneer's interest was expressed some days or weeks after the Ellsworth proposal began to take form.

was made should be condemned as unreasonable, given all the troubling circumstances facing Ravine and Carver.

The burden of showing reasonableness is on the creditor, but the debtor's lack of proof to the contrary is considered in weighing the evidence. *C.I.T. Corp. v. Duncan Grading & Const., Inc.*, 739 F.2d 359, 361 (8th Cir.1984). Speculative alternatives to a criticized sale should be given slight weight. The point is ruled in favor of plaintiff.

### III.

■ The remaining major question is how much Dr. Feeny owes plaintiff. On the face of the Truth–in–Lending Disclosure that served to record the obligation the amount financed was $400,000. P.Exh. 1. This "note" was signed July 4, 1983, and dated July 8, 1983. The payment obligation was not set forth on the face of the note, but there was a reference to Attachment "A." Additional Attachments B and C were appended. Attachment A was signed by the lender and by defendant Allen as president of IFS. A principal payment schedule shows no payments prior to July 8, 1984, payments of $20,833.33 per month during the next year, and a balance due of $3,250,000.04 on July 8, 1985.

Attachment B (P.Exh. 4) was a pledge and security agreement signed by parties other than Dr. Feeny, relating to collateral security for "eight separate loans represented by separate but similar promissory notes." The loan to Dr. Feeny was listed in the amount of $400,000. Attachment C (part of P.Exh. 4) was a guaranty agreement signed by persons other than Dr. Feeny, noting that the total aggregate amount of the notes was $3,500,000.

The Feeny loan was set up in the lender's books in the amount of $400,000. P.Exh. 6.

By further agreement IFS agreed to pay all loans entered into for its benefit. P.Exh. 9. On July 2, 1985, the lender's attorney demanded of Dr. Feeny "immediate payment of the unpaid principal balance...." The letter was referenced to the Feeny "promissory note dated July 8, 1983, in the sum of $400,000.00."

The documents are somewhat garbled in their provisions. They cannot be reasonably construed, however, to impose a major obligation beyond repayment of the principal amount advanced to Dr. Feeny, that is, $400,000.[3] The references to the larger aggregate sum exceeding three million dollars would best be understood by a borrower not guaranteeing payment of the larger sum as a cross-reference to the larger aggregate transaction. IFS had assumed the obligation to make that total payment, as evidenced both by the signature lines on Attachment A and the explicit agreement by IFS assuming the total obligation.

It is true that this reading of the related documents would not disclose a precise repayment schedule for the Feeny note. If the documents were deemed to be incomplete in that respect the lender would be entitled to seek repayment of the loan of $400,000 plus legal interest. The alternative, which I find more reasonable, would be to treat the documents in accordance with the apparent intent of the parties and to conclude that proportionate repayment was to be made by Dr. Feeny in the event of a default by IFS.[4] Clearly he cannot be said to have guaranteed payment of the entire aggregate, as other individuals did in Attachment C.

The documents show IFS was a guarantor of the aggregate and that Balanced Security, like Dr. Feeny, was obligated only on a constituent note. The Balanced Security note was for $450,000.

---

**3.** I accept arguendo the contention that the larger obligation may have been split up to avoid exceeding the lending limit. The fact remains that Dr. Feeny assumed responsibility for only part of the larger transaction.

**4.** In plaintiff's first amended complaint, filed before the sale of the collateral and application of the proceeds to reduce the indebtedness, plaintiff alleged that Dr. Feeny was obligated on his $400,000 note, with a then-current balance of some $335,000, whereas IFS was liable for the full indebtedness of over $2,900,000. One must agree with this 1985 pleading rather than plaintiff's current position. Plaintiff viewed the allocation issue more clearly before the other potential sources of repayment went dry.

Turning to questions of allocation, neither party in post-trial briefing supplies any pertinent legal citations. Defendants calculate from Plaintiff's Exhibit 14 an apportionment of liability on the Feeny note of $150,136.17 and a cost allocation of $18,242.00. They calculate an apportionment of liability on the Balanced Security note of $168,904.25 and a cost allocation of $20,522.15. The IFS liability would be in the total unreimbursed sum of $1,313,699.76 on the notes and $159,618.50 for expenses.

The court accepts the calculations of the total unreimbursed principal, interest and expenses, which are reasonable in amount. The allocations to particular defendants are not persuasively challenged by plaintiff, which argues essentially that each defendant should be responsible for the entire amount. The allocations in defendants' post-trial brief (Doc.160) are accepted by the court.

It is therefore ORDERED that judgment be entered in favor of plaintiff and against defendant IFS in the amount of $1,473,318.26; in favor of plaintiff and against defendant Feeny in the amount of $168,378.17; and in favor of plaintiff and against defendant Balanced Security in the amount of $189,426.40. Costs assessed in favor of plaintiff.