In re Frank D. FRAZIER aka Frank David Frazier.

James F. CHAVERS and Linda H. Chavers

v.

Frank D. FRAZIER.

Jamie Carter FRAZIER and Jamie, Inc.

v.

Frank D. FRAZIER.

NASHVILLE CITY BANK & TRUST CO.

v.

Jamie Ross FRAZIER.

Bankruptcy No. 386–03401.

Adv. Nos. 386–0397, 386–0341.

United States Bankruptcy Court, M.D. Tennessee.

March 23, 1988.

James V. Doramus, Doramus & Trauger, Nashville, Tenn., for Jamie Carter Frazier and Jamie, Inc.

William A. Cragg, Douglas A. Brace, Ortale, Kelley, Herbert & Crawford, Nashville, Tenn., for James F. and Linda H. Chavers.

David Parker, Nashville, Tenn., for Nashville City Bank.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE C. PAINE, II, Chief Judge.

This action involves claims brought by James F. and Linda H. Chavers against Frank D. Frazier, his wife, Jamie Carter Frazier, a business owned by Mrs. Frazier known as Jamie, Inc., and a business owned by Mr. Frazier known as Conn–Aire, Inc. Initially filed in the Chancery Court for Williamson County, Tennessee, the action was removed to the United States District Court for the Middle District of Tennessee, following the filing of petitions for bankruptcy in this Court for Mr. Frazier and Conn–Aire, Inc. Following removal, it was remanded to this Court by agreement of the parties.

The action arises out of a claim for the balance due or deficiency after sale of collateral on a secured note. On March 23, 1985, Frank D. Frazier, Conn–Aire, Inc. and Jamie, Inc., co-signed a Promissory Note payable to First Tennessee Bank (hereinafter referred to as the "Bank") for the sum of $850,000.00. The Note was consideration for a loan, the proceeds of which were used by Mr. Frazier, Conn–Aire, Inc. and Jamie, Inc. in the purchase of a Lear jet from Mr. and Mrs. Chavers for use by Conn–Aire, Inc. in its business. Mrs. Frazier signed a guaranty agreement guaranteeing the obligations of Jamie, Inc.; Mr. and Mrs. Chavers signed a blanket guarantee for the Note, not limited to any particular obligor. The Bank obtained and properly filed a security interest in the aircraft.

In February, 1986 the Note went into default when financial difficulties arose at Conn–Aire, Inc. Subsequently Conn–Aire, Inc. filed a petition pursuant to Chapter 11 of the Bankruptcy Code, and Frank D. Frazier filed a petition for protection under the Bankruptcy Code in this Court. Following the filing of the bankruptcy petition of Conn–Aire, Inc., the Bank obtained relief from the automatic stay and was given possession of the aircraft pursuant to its rights under the security agreements. The Bank filed a Complaint against the Chavers, Jamie Carter Frazier and Frank Frazier. The Chavers negotiated a settlement of the Bank's claims on their guaranty by purchasing the Bank's Note and obtaining an assignment of the Bank's rights under the Note. In structuring an agreement with the Chavers, who took possession of the plane, the Bank forced the Chavers to accept a requirement to sell the aircraft in

sixty (60) days. Diane Porter, an Officer of the Bank who negotiated the assignment of rights, testified that the Bank required the Chavers to sell the plane within sixty (60) days and the Chavers testified that they agreed to such a condition, all without the consent of Mrs. Frazier or Jamie, Inc. The Chavers, on their own behalf and as the assignees of the Bank's rights, prosecuted this action against Mrs. Frazier and Jamie, Inc.

The Chavers bear the burden of proof on the two principal issues: (1) whether the aircraft was sold in a commercially reasonable manner, *Cullum & Maxey Camping Center, Inc. v. Adams,* 640 S.W.2d 22 (Tenn.App.1982); and, if not, (2) whether the presumption that its fair market value equalled the indebtedness secured was rebutted. *United States v. Willis,* 593 F.2d 247, 261 (6th Cir.1979); *In re Anderson,* 50 B.R. 137, 142 (W.D.Mich.1985); *FDIC v. Morgan,* 727 S.W.2d 500, 501 (Tenn.App. 1986).

■ In Tennessee the disposition of collateral by a secured party must, in every aspect, including the method, manner, time, place and terms be "commercially reasonable". T.C.A. Section 47–9–504(3). The standard is further defined in T.C.A. Section 47–9–507(2):

> If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner.

"Commercially reasonable" manner in Tennessee means disposition "in keeping with prevailing trade practices among reputable and responsible business and commercial enterprises engaged in the same or a similar business." *Mallicoat v. Volunteer Finance & Loan Corp.,* 57 Tenn.App. 106, 415 S.W.2d 347, 350 (1966), quoted in *Trimble v. Sonitrol of Memphis, Inc.,* 723 S.W.2d 633, 641 (Tenn.App.1986). The term "commercially reasonable" by itself gives little guidance for the analysis of any particular case; this Court has previously identified those six (6) factors by which compliance with prevailing commercially reasonable practices may be measured. They are:

1. The type of collateral involved;
2. The condition of the collateral;
3. The number of bids solicited;
4. The time and place of sale;
5. The purchase price received or the terms of sale; and
6. Any special circumstances involved.

*Pippin Way, Inc. v. Four Star Music Co.,* 2 B.R. 454, 461 (M.D.Tenn.1979).

■ In order to make the determination of commercial reasonableness, we must look to the facts and circumstances of the sale. Following repossession of the aircraft and the transfer of rights to the Chavers, the Lear jet was sold at a public sale. The aircraft, which sold to Frank Frazier's group for $850,000.00 in March, 1985, was sold in April, 1986 for $415,-000.00. Although failure to procure the best price for collateral does not in and of itself make a sale commercially unreasonable, T.C.A. Section 47–9–507(2), and reasonableness is primarily assessed by the procedures employed, "a sufficient resale price is the logical focus of the protection given debtors ...." *Smith v. Daniels,* 634 S.W.2d 276, 278 (Tenn.App.1982). The great disparity between the purchase price and the sale price of the collateral approximately one (1) year later raises the issue of whether the total circumstances demonstrate that the Chavers took all steps considered reasonable by prevailing practices to insure that the sale of the Lear jet would bring a fair price. *Smith v. Daniels,* 634 S.W.2d at 278. After reviewing the circumstances of· the sale and the relevant legal factors, the Court determines that the Chavers have not met their burden for the following reasons.

Procedures employed to sell small jet aircraft are matters particularly within the knowledge of a small group of persons who

are experts in the highly technical endeavor. The Chavers offered the testimony of two (2) experts, and Jamie, Inc. and Mrs. Frazier offered a third expert, Mr. Charles Mulle. After considering both the demeanor and the relative qualifications of these experts, the Court finds that Mr. Mulle was by far the pre-eminent expert. Mr. Mulle was a graduate of Riddle Aeronautic Institute where he received a Bachelor of Science Degree in Aeronautic sciences with a minor in aviation management. Prior to attending Riddle Aeronautic Institute, he served in Army aviation for four (4) years and assisted in the testing projects for certain military aircraft. He has served as a Canadian bush pilot, a corporate pilot, and since 1975 has been employed full time in the commercial aircraft leasing sales and management area. Since 1981 he has been the principal owner of Business Aircraft Leasing, Inc., a company which is solely involved in the buying, selling and leasing of corporate and commercial aircraft. In addition, Mr. Mulle had specific knowledge of the aircraft at issue in this case from the date it was initially ordered from the manufacturer. He had been responsible for leasing the aircraft and had subsequently sold the aircraft to Mr. Frazier, Conn–Aire, Inc. and Jamie, Inc. One of the Chavers' expert witnesses agreed that Mr. Mulle was a competent and knowledgeable person in the field of aircraft sales and procedures. The other expert witness offered by the Chavers advised the Court that he respected Mr. Mulle's opinion and looked to him for information and advice. Mr. Mulle's experience was far in excess of that of the Chavers' experts.[1] Based on his experience, candor and qualifications, the Court finds Mr. Mulle highly credible and uniquely qualified to assist the Court in its determination.

The value of the aircraft at the time of its sale to Mr. Frazier, Conn–Aire and Jamie, Inc. was approximately $825,000.00 to $850,000.00, as established by the testimony of the banker who initially granted the loan to the Chavers. Mr. Mulle testified that the value was in that range and may have contained a premium of approximately $25,000.00 to $50,000.00 because the initial sale was one hundred percent (100%) financed.

1. *The Hasty Sale Was Not Reasonable.*

The plaintiffs gained possession of the aircraft on May 2, 1986 and sold it at public auction on June 3, 1986. The Court finds the plaintiffs acted with unreasonable haste in their efforts to sell the aircraft, apparently in order to satisfy the time requirement imposed by the Bank.

The collateral at issue is a jet aircraft with a highly specialized and limited market. Under the circumstances of this case, the Court finds that the time permitted to advertise and market the plane to this select group of potential buyers was grossly inadequate. The Chavers could not satisfactorily explain their actions in April and May of 1986, but the following is clear from the record. First, the Chavers voluntarily observed the condition of selling the aircraft within sixty (60) days. Their principal advisor, who also testified at trial, was extremely inexperienced in the commercial sale of jet aircraft. The plaintiffs were aware that Mr. Mulle had worked on the aircraft previously and that he was available to assist them in the sale of the aircraft, yet neither the Chavers nor their advisors sought Mr. Mulle out for advice or aid. The plaintiffs' advisor knew of the proposed repossession on April 23, 1986 and that the custody of the aircraft would pass to the Chavers on May 2, 1986, but made no immediate recommendations as to the means of disposing of the aircraft. After "investigating options" for at least two (2) weeks, he and the Chavers made the initial decision to sell the aircraft at auction approximately three (3) weeks prior to the actual sale. All advertising for the sale

---

1. The Chavers' expert, who actually assisted them in devising a plan for the sale, testified that he had never conducted a retail sale of jet aircraft prior to the transaction in question.

was done from May 20, 1986 to May 29, 1986 and terminated within five (5) days of the sale.

The other expert witnesses, including the Chavers' own expert, believed greater time was needed to explore and reach the potential market. The Chavers' other expert witness testified that six (6) months to one (1) year was needed for the fair and proper sale of such an aircraft. Mr. Mulle considered ninety (90) days to be an appropriate, although minimum, time frame to judge the market and to make commercially reasonable efforts.

Regardless of the specific time requirements, which this Court does not determine, it is clear to the Court that the time requirement agreed to by the Bank and the Chavers was, in itself, unreasonable. The Court further finds that the Chavers sold an expensive and sophisticated jet aircraft in half the unreasonably brief time permitted by their agreement with the Bank and that this hasty sale was a significant cause of the low sale price. The Court further notes that the Chavers did not request an extension of the sale date requirement, that there were no adverse consequences to a delay of up to six (6) months based on the structure of the Chavers' loan with the Bank and that Mr. Chavers is a sophisticated and professional investor. Under these circumstances, the time allotted prior to the sale was inadequate and not commercially reasonable.

## 2. *The Advertising Was Not Adequate.*

The Court considered substantial testimony concerning the adequacy of the advertising and further determines that the advertising was wholly inadequate for a commercially reasonable sale. *See Connex Press, Inc. v. International Automotive, Inc.,* 436 F.Supp. 51, 55 (D.C.1977) (Advertisements of airplane sale written so cautiously as "to in no way encourage buyer interest" and failure to contact dealer groups partial basis for finding sale unreasonable). Advertisements ran briefly in the Wall Street Journal and a trade publication known as Trade–A–Plane. The advertisements were described by Mr. Mulle as telegraphing a distress sale during "a brief flurry of advertising". Even one of the Chavers' experts felt that the use of the "as-is" phrase in the text of the advertising suggested a distress sale.

Mr. Mulle described a reasonable advertising protocol as follows. He testified first that in advertisements in the Wall Street Journal and Trade–A–Plane should be positive and run for an appropriate length of time. The Chavers' advertisements ran briefly and suggested a distress sale. He also testified that the potential market for jet aircraft was concentrated in corporations and professional aircraft brokers throughout the country. From this pool of qualified buyers the most likely prospects should have been determined; the particular needs of a buyer should have been addressed in a formal sales effort, including if necessary, taking the aircraft for a buyer to view. While the Chavers provided some information to those who responded to their advertisements, such information was described by Mr. Mulle as "laughable" and indicative of an amateur effort to sell the aircraft. The sales packet provided by the Chavers' advisor to potential buyers did not include a log book summary or copy of the log book, which even the Chavers' advisor admitted was important information to a potential buyer and would reflect the high degree of maintenance required by the Federal Aviation Authority for commercial and charter work.

## 3. *A "Distress Sale" Auction Was Not Reasonable.*

The method of sale is also an important factor. Under these circumstances, the Court finds that an initial effort to contact the fairly limited pool of qualified commercial buyers would have been in keeping with prevailing responsible practice, and not immediate resort to the public sale option, which in the words of even the Chavers' experts, is ordinarily a "last resort"

method of sale. The Court finds the use of a public auction, under these circumstances, was not reasonable. It could be expected to draw only those it did—experienced wholesale aircraft dealers in an already small potential market looking for a distress type "deal". Potential retail buyers who would normally have concerns about the aircraft that could be addressed in the normal course of business were not identified and could not be reasonably presumed to attend an auction advertised in this manner within this time frame. This method of sale, while always a possibility, under these facts immediately telegraphed the message that this was a "fire sale". Under these circumstances, there was no reason initially to conduct such a distress disposal of the aircraft, and the Court finds it commercially unreasonable to have done so.

### 4. Aircraft Maintenance Was Not Properly Addressed Prior To The Sale.

A great deal of attention focused on the need for a "hot section inspection" on the aircraft. According to the rules and regulations of the Federal Aviation Authority, jet engines have to be inspected and, if necessary, overhauled. Estimates of the cost of performing this service were varied. From the testimony, it appears to the Court that the Chavers did not even consider whether this work should be accomplished and borne as a cost prior to sale, and if so, what effect it would have on resale value. The Court finds that under the circumstances, and in light of the condition of this particular airplane, a hot section inspection was an important and necessary step to prepare the plane for sale and failure of the Chavers to undertake the inspection seriously lessened their ability to obtain a fair price for the aircraft. The Chavers also failed to investigate paint options, possible financing options and a procedure for either undertaking or "capping" the hot section changes, which process likely would have allowed for recoupment of these charges upon sale. The failure to reason-

ably prepare the aircraft for sale, in the determination of this Court, constitutes a commercially unreasonable manner of sale.

### 5. The Purchase Price Was Not Reasonable.

The final factor is the purchase price obtained at the sale. Although this factor is not, by itself, determinative, it is a factor to consider. The proof in this case showed that even though the plane sold for $415,-000.00, it was insured at that time for $700,000.00, as testified to by the bank officers. Even the Chavers' expert, Mr. Bunyan, was "surprised" that the plane sold for $415,000.00. Mr. Chavers testified that he thought the value of the plane was in the neighborhood of $700,000.00 when it was returned to him. Mr. Mulle testified that it was ludicrous to think that the fair market value of the plane could decrease by approximately one-half of its sale value a year earlier. The Court finds that the sale price corroborates Mr. Mulle's testimony that the Chavers failed to follow prevailing practices in responsible sales of this type: positive advertising, a more reasonable time frame for promotion and sale, more targeted yet wider dissemination of information about the aircraft, better information provided to prospective buyers, preparation of the aircraft for sale and a reasonable attempt to make a retail sale in the first instance. The Chavers' testimony demonstrates that of all these steps could have been accomplished, but were not even addressed.

The evidence shows that the low sale price cannot be explained by the condition of the aircraft upon foreclosure. During the fifteen (15) months between the sale and foreclosure the plane was used by Conn–Aire, Inc. for passenger and cargo flights. This use caused Conn–Aire to observe stricter standards than ordinarily imposed on a privately owned aircraft, to comply with Federal Aviation Authority regulations. Accordingly, even though the plane was used steadily by Conn–Aire, it was regularly maintained and inspected

pursuant to those FAA standards. The condition of the plane was readily ascertainable from the aircraft maintenance log books which were available to interested buyers for the aircraft. The testimony indicates that even a small amount of money to refurbish the plane, and a thorough cleaning would have drastically affected its "eye appeal", and would have been part of a reasonable effort to dispose of the plane so as to obtain a fair price.

### 6. The consequences Of An "Unreasonable" Sale.

■ Finding that the sale was not commercially reasonable, it is necessary to address the fair market value of the plane at the time of sale to determine if the Chavers are nevertheless entitled to a deficiency judgment. There is some measure of speculation involved in ascertaining "what might have been". The risk of not being able to determine what would have happened as a result of a reasonable sale must fall on those responsible for the such a sale not actually occurring. Accordingly, once the determination has been made that the sale was not commercially reasonable, there is a presumption that the fair market value of the aircraft equaled the indebtedness secured or, in this case, the amount sought as deficiency. *United States v. Willis*, 593 F.2d 247, 261 (6th Cir.1979); *F.D.I.C. v. Morgan*, 727 S.W.2d 500, 501 (Tenn.App.1986). It is the burden of the secured party to rebut this presumption and failure to rebut the presumption with evidence of fair market value in the record results in denial of the secured party's claims for deficiency judgment. *Willis*, 593 F.2d at 261; *In Re: Anderson*, 50 B.R. 137, 142 (W.D.Mich.1985); *Morgan*, 727 S.W.2d at 502.

■ The evidence introduced by both parties is not sufficient for the Court to determine with a reasonable degree of certainty what the fair market value of the aircraft was on the date of the sale, or the amount that would have been realized if the sale had been conducted in a commercially reasonable manner. The Chavers proceeded on the theory that the sale was in fact reasonable and therefore, apparently as a matter of trial strategy, did not introduce evidence of a reasonable sale price other than the amount they obtained at the sale, $415,000.00. Having carefully evaluated the qualifications of the experts and having carefully listened to the testimony of each, the Court cannot fix with any reasonable degree of certainty what the fair market value of the aircraft was on the date of the sale. The Court is without a sufficient factual basis to conclude that the presumption has been rebutted, *see, e.g. United States v. Willis*, 593 F.2d at 261, and therefore holds that Mrs. Frazier and Jamie, Inc. owe nothing to the Chavers.

The parties have raised various other issues in connection with this action. As a result of the Court's finding that the sale was not commercially reasonable and that the presumption that the indebtedness was equal to the fair market value has not been rebutted, it is not necessary to reach these or any issues raised other than those addressed herein.

For the reasons set forth in this opinion judgment is rendered in favor of the defendants Jamie, Inc. and Jamie Carter Frazier. The claims of the Chavers are dismissed and the costs of this action are taxed against the Chavers.