**In re Andrew Lee YOUNGBLOOD, Debtor.**

**AUTOMOTIVE FINANCIAL SERVICES, INC., f/d/a Kimbrough Properties, Inc., Plaintiff,**

**v.**

**Andrew Lee YOUNGBLOOD, Defendant.**

**Bankruptcy No. 93–21295–D.**
**Adv. No. 93–0645.**

United States Bankruptcy Court,
W.D. Tennessee,
Western Division.

May 19, 1994.

Roger Stone, Memphis, TN, for plaintiff.

Tracey Malone, Memphis, TN, for defendant.

John Kimbrough, Automotive Financial Services, Memphis, TN.

## MEMORANDUM OPINION AND ORDER RE COMPLAINT TO DENY DISCHARGEABILITY OF DEBT AND FOR JUDGMENT

BERNICE BOUIE DONALD, Bankruptcy Judge.

This core proceeding came on to be heard on the adversary complaint of Automotive Financial Services, Inc., ("Kimbrough Properties" "AFS" or "plaintiff") seeking to have its debt declared nondischargeable and seeking a monetary judgment. The Court has jurisdiction by virtue of 28 U.S.C. § 157(b)(2)(i) and 1334.

The following shall constitute the Court's findings of fact and conclusions of law pursuant to F.R.B.P. 7052.

### BACKGROUND FACTS

Defendant Youngblood entered into a financing arrangement with plaintiff through an entity known as A & M Auto Sales, Inc. in 1989. Initially, A & M was organized as a partnership. In 1989, the partner left and debtor incorporated the business and became the majority and sole stockholder, president, and director. His former wife was secretary-treasurer, but was not a shareholder. On or about March 1990, the corporation and the plaintiff entered into an automobile floor planning credit line agreement and security agreement which agreements were personally guaranteed by the defendant. Trial Exs. 2–6. As a precondition to opening the financing line of credit, defendant provided certain financial information to Kimbrough on himself and his wife. *See* Trial Ex. 1.

In addition, the defendant's corporation sold individual conditional sale contracts with certificates of title to the plaintiff under certain documents known as repurchase agreements. In the event the contractual purchaser failed to pay in accordance to the terms and conditions of the conditional sales contracts, Kimbrough had recourse against A & M. There came a time when defaults occurred under the contracts. Defendant testified that while he was current in his obligations, he felt economic strain and subsequently abandoned the business.

On or about January 1992, defendant left Memphis for Wisconsin where he remained for approximately one year. It is undisputed that defendant left under cover of darkness without notifying the secured creditor or any other creditors of his departure or whereabouts. Prior to departing, the defendant filed bankruptcy.[1] The bankruptcy was dismissed. In defendant's original bankruptcy,

---

1. Case No. 91–34283–D was filed December 26, 1991. Case was dismissed March 12, 1992.

Kimbrough filed a motion seeking a lifting of the automatic stay; however, no hearing occurred because defendant's case was dismissed prior to a hearing on the motion.

In the course of reviewing the contracts purchased from A & M, as well as the floor plan agreement, plaintiff became aware that defendant had previously pledged numerous assets which had been pledged as security for the debts due and owing the plaintiff. *See,* Trial Exs. 2 and 3. Plaintiff had no prior knowledge that these assets securing plaintiff's loan had previously been pledged or that plaintiff's lien position may have been impaired.

Plaintiff obtained possession of the collateral and in March 1992, conducted a sale of the floor plan inventory which consisted of some 28 vehicles for which he obtained a total price of $6,000. In explaining the low price, plaintiff testified that the automobiles were in a state of disrepair and many of them had suffered vandalism. The year, make, and floor plan loan, as well as the wholesale purchase price ranges are set forth below: [2]

| Vehicle Type | Loan Amount & Date (Floor Plan) | | Wholesale Value (Range) | Credit Sale |
|---|---|---|---|---|
| 1983 Audi | $ 2300 | | $1400–2700 | $206.90 |
| 1983 Buick Riveria | $ 3400 | | $ 400–2700 | $206.90 |
| 1981 Pontiac | $ 1600 | 9–11–91 | $1000–1950 | $206.90 |
| 1983 Buick LeSabre | $ 2000 | | $1800–2725 | $206.90 |
| 1979 Buick Riveria | $ 1885 | 9–13–91 | $1850–1275 | $206.00 |
| 1980 Chrysler Cordova | $ 680 | 9–23–91 | $ 550–800 | $206.90 |
| 1984 Ford T–Bird | $ 800 | 9–24–91 | $2150–3100 | $206.00 |
| 1978 Mercury | $ 530 | 9–27–91 | $ 575–800 | $206.00 |
| 1981 Oldsmobile | $ 900 | 9–27–91 | $1675–2875 | $206.00 |
| 1978 Dodge Pickup | $ 675 | 9–27–91 | $ 675–1375 | $206.00 |
| 1982 Chevrolet Citation | $ 600 | 9–27–91 | $ 675–1075 | $206.00 |
| 1978 Ford F–10 Pickup Truck | $ 1065 | 9–27–91 | $1725–2425 | $206.00 |
| 1984 Dodge Diplomat | $ 1417 | 11–11–91 | | $206.00 |
| 1978 Chevrolet Camaro | $ 1275 | 10–11–91 | $ 825–1500 | $206.00 |
| 1984 Dodge Diplomat | $15000 | 1–4–92 | | $206.00 |
| 1982 Mazda | $ 400 | 10–15–91 | $ 550–1025 or | $206.00 |
| 1983 Plymouth Horizon | $ 700 | 10–17–91 | $ 600–1200 | $206.00 |
| 1977 Lincoln Continental | $ 605 | 10–24–91 | $ 600 | $206.00 |
| 1980 Honda Civic | $ 660 | 11–06–91 | $ 675–1150 | $206.90 |
| 1980 Ford T–Bird | $ 1047 | 11–20–91 | $ 80–1275 | $206.90 |
| 1981 Pontiac Firebird | $ 2258 | 11–20–91 | $2225–3225 | $206.90 |
| 1984 Dodge | $ 1024 | 1–22–91 | $2000–3000 | $206.90 |
| 1984 Chevrolet Celebrity | $ 2190 | 12–3–91 | $1575–2575 | $206.90 |
| 1984 Ford Tempo | $ 1274 | 12–3–91 | $1375–2225 | $206.90 |
| 1984 Dodge | $ 1500 | 12–4–91 | $1400–2350 | $206.90 |
| 1983 Ford Escort | $ 955 | 1–9–92 | $ 650–1125 | $206.90 |

The issue for judicial determination is whether debtor obtained money, property or services by false pretenses, false representations, or actual fraud such that the corresponding debt should be declared nondischargeable under 11 U.S.C. § 523(a)(2). The overarching issue, however, is whether the sale of the collateral was made in a commercially reasonable manner pursuant to T.C.A. § 47–9–504.

The burden of proof is on the party seeking to have the debt excepted from discharge. *See, In re Ward,* 857 F.2d 1082 (6th Cir.1988). The standard of proof is a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654 112 L.Ed.2d. 755 (1991).

The proof adduced at trial is that debtor presented to plaintiff evidence of his financial condition for purposes of obtaining a loan. Moreover, defendant as a part of his financial

**2.** Trial Ex 9 reflects this data in relevant part.

statement, listed certain assets which would serve as collateral for his line of credit. Moreover, defendant represented verbally or in writing that those assets were not otherwise pledged. Based on debtor's actions and representations, plaintiff was led to believe that defendant was a good credit risk and that he had the means to repay the loan if the business defaulted. Moreover, plaintiff believed that he was acquiring a first lien position, when in fact there was a prior lien holder with arguably a first lien position. Plaintiff contends that this constituted a material misrepresentation on which plaintiff relied to its economic detriment.

Next, plaintiff avers, and defendant concedes, that debtor had one of debtor's employees forge debtor's wife's signature to the loan guaranty documents. Plaintiff contends that this act of forgery represented an intentional act of fraud per se which deprived plaintiff of any right to pursue defendant's spouse. It was a material part of plaintiff's business that both husband and wife would be liable on the loan. Debtor maintains that plaintiff was aware of the forgery and condoned it; however, plaintiff disputes debtor's assertions. There were no witnesses to corroborate debtor's statements. Debtor avers that he at all times advised the plaintiff that his wife would not sign the loan guaranty documents because she did not want him in the car business and in response plaintiff advised him to "just get a signature."

■ Actual fraud consists of any deceit, artifice, trick, or design ... done with the design of perpetuating what is known to be a deception. 3 Collier on Bankruptcy ¶ 523.08 (15th ed. 1992). *See also, Knoxville Teachers Credit Union v. Parkey,* 790 F.2d 490 (6th Cir.1986) Although 11 U.S.C. § 523(a)(2)(A) does not expressly require that the creditor reasonably rely on the debtor's false representation, such a requirement is implied. *In re Ledford,* 970 F.2d 1556 (6th Cir.1992). Recklessness in submitting a fi-

nancial statement known to be false satisfies the intent to deceive. *See, In re Batie,* 995 F.2d 85 (6th Cir.1993).

■ The Court finds debtor's testimony about plaintiff's complicity in the fraud lacking in credibility. Debtor contends that plaintiff was aware that his wife would not sign the document and plaintiff induced the fraud by telling debtor to just obtain a signature. If this were actually the case, there would have been no reason for debtor to bring a female into the office, represent her as his wife, and have this female sign his wife's name. If plaintiff was a knowing and willing participant in the fraud, plaintiff could merely have looked the other way while debtor signed his wife's name. Based on the facts adduced at trial, and the applicable case law, the Court finds that debtor's misrepresentation, omission, and fraudulent actions in obtaining financing from plaintiff by having his wife's signature forged, constituted an actual fraud such that the debt should be declared nondischargeable.

Once a court has determined a debt to be nondischargeable, the court may proceed to determine the merits of the underlying claims, including the amount of the debt which is also a core matter. *In re McLaren,* 990 F.2d 850 (6th Cir.1993).

Plaintiff seeks a nondischargeable judgment in an amount not to exceed $75,000.[3] At trial, plaintiff testified to the following statement of account as of March 17, 1992: [4]

Balance Due On—

| | |
|---|---|
| —Floor Plan | $57,206.28 |
| —Extended Floor Plan Recourse & Extended Floor Plan | $12,352.05 |
| —Transaction Fees | $ 7,842.74 |
| —Recourse Paper | $16,601.00 |
| **TOTAL** | **$94,002.07** |

Plaintiff applied a 10% interest factor through the petition date for a balance due on an account as of February 4, 1994 of $102,462.26.

---

**3.** *See* plaintiff's adversary complaint.

**4.** Trial Ex 7.

As of May 4, 1994 plaintiff testified that the account balance was $115,388.89. Plaintiff further testified that credits had been applied from the sale. From the sale proceeds, plaintiff paid United American Bank ("UAB") $1,761 to settle a lien dispute, plus approximately $3,000 in other administrative fees connected to the sale, and storage fees, all of which were deducted from the gross amount. Plaintiff testified that certain payments have been received and applied for the recourse paper, but plaintiff could not provide information on the amount of those credits.

Defendant asks the Court to find that debtor is not obligated to plaintiff for any deficiency because the sale was not conducted in a commercially reasonable manner, or in the alternative, that defendant is entitled to a set-off for the fair market value of the vehicles at the time of sale.

Plaintiff contends that the sale was conducted in a commercially reasonable manner such as to bring the highest value for the cars.

■ A commercially reasonable sale is tested by the procedures employed for the sale rather than the proceeds received, but the terms of the sale bear scrutiny, and the elements of the manner, method, time, place and terms are to be viewed as necessary and interrelated parts of the whole transaction. *In re Four Star Music Co., Inc.*, 2 B.R. 454 (Bankr.M.D.Tenn.1979). Commercial reasonableness is a matter to be determined by state law. *In re Four Star Music* dealt with whether the sale of a music catalog was commercially reasonable, and after applying the requirements of the statute, that court found that the sale was not commercially reasonable.

■ The procedure to be followed is outlined in T.C.A. § 47–9–507(2):

" ... If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such a market at the time of his sale or *if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercial-*

*ly reasonable manner."* (emphasis added.)

T.C.A. § 47–9–504(3) provides that

"Disposition may be public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but *every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.* ... (emphasis added)

Although the statute has not attempted to define the parameters of the term "commercially reasonable", case law has specified six facts by which the statutory requirements may be measured:

(1) the type of collateral involved;

(2) the condition of the collateral;

(3) the number of bids solicited;

(4) the time and place of sale;

(5) the purchase price received or the terms of sale; and

(6) any special circumstances involved.

*Id.* (citations omitted)

■ The law in Tennessee on commercial reasonableness considering the above factors is set forth in *In re Frazier*, 93 B.R. 366, 368 (Bankr.M.D.Tenn.1988), where the court opined:

"Commercially reasonable" manner in Tennessee means disposition "in keeping with prevailing trade practices among reputable and responsible business and commercial enterprises engaged in the same or a similar business."

■ In making the determination of commercial reasonableness, the Court must look to the totality of the facts and circumstances surrounding the sale. In the instant case, the defendant abandoned the car lot in late December 1991, just before New Year's Eve. The unrebutted testimony is that the cars were on a lot enclosed by a six-foot wire fence with a locked gate. Defendant locked the gate before leaving, and testified that his son occasionally inspected the lot. Moreover, prior to defendant's departure, plaintiff's inspector made a physical inspection of the lot at least monthly. Plaintiff took pos-

session of the fleet sometime after March 12, 1992, and conducted the sale March 16, 1992.[5] Plaintiff sold the entire fleet for a gross sales price of $6,000. Plaintiff testified that the sale was not advertised, nor did plaintiff attempt to sell the vehicles seriatim. Plaintiff contacted two or three individuals known to be in the used car business and invited them to bid. The $6,000 bid was the higher of the two bids. There was no other testimony regarding the bid process. Plaintiff testified, however, that UAB approved the bids.

Plaintiff testified that it was necessary to dispose of the cars quickly because they were incurring storage charges. As defendant pointed out, the vehicles were moved from the original site where the charges were minimal, to a new site wherein they incurred storage charges. At the time of the sale, plaintiff allegedly had incurred some $575 in storage charges.

AFS financed the cars for approximately $50,000 in the fall of 1991, and in the spring of 1992, sold the cars in bulk for $6,000. Although the failure to obtain the best price for collateral does not in and of itself make a sale commercially unreasonable, it is one factor that the Court must seriously consider as a protection afforded debtors. *See, In re Frazier, supra.* In *Frazier* where the court considered the circumstances surrounding the sale of a Lear jet, the court found that the disparity between the purchase price and the sale price over the span of one year raised the specter of unreasonableness. *Id.* The circumstances of this case raise similar, if not more grave, concerns where the value of the collateral allegedly lost approximately 90% of its value over a three month period.

The Court finds that the plaintiff's actions in dealing with the collateral were hasty; were not designed to get the highest value; and that the sale was not conducted in a commercially reasonable manner.

The collateral at issue in this case is used cars primarily marketed through "we tote the note" dealerships which serve a clientele often unable to get credit through more traditional means. The subject cars were generally older, but commanded impressive retail prices. *See* Trial Ex. 9.

There was no testimony of the estimated cost required to put the cars back in a saleable condition. Plaintiff testified that the inventory was in bad shape, that "vandalism had occurred, batteries were missing, etc." Plaintiff offered no inspection or condition reports on the vehicles, nor were photos offered to give the Court a description of the vehicles prior to the sale. Plaintiff's statements were general sweeping statements which provided the Court no basis on which to make any determination of the reasonableness of plaintiff's actions, or the fair market value of the cars on the date of the sale.

In *Frazier* where the sale of collateral yielded only 59% of the purchase price one year later, the court found the sale to have been commercially unreasonable.[6] Thus, where plaintiff financed inventory for approximately $50,000 in the fall of 1991, repossessed and sold the inventory—28 vehicles—in spring of 1992 at a private sale for a gross sale of $6,000 within a week of gaining possession, and incurred expenses in connection with the sale in the amount of $3,000, a rebuttable presumption of commercial unreasonableness is raised. There was no testimony that plaintiff invested any money in the vehicles in order to enhance the sales price, or to increase the number of bids. Plaintiff simply disposed of the vehicles and rested on the personal guaranties securing the obligation.

In seeking to support the reasonableness of the sale, plaintiff pointed to the fact that the bank approved the bids. The Court finds this reasoning unpersuasive, as the Bank was not looking to the vehicles as primary security for its loan. UAB's loan was secured by the equity in the debtor's residence. Moreover, the Court cannot infer reasonableness from the Bank's actions, since the Bank was

---

5. In court, plaintiff's counsel explained that plaintiff's motion to lift the § 362 automatic stay was never heard because the bankruptcy case was dismissed prior to a hearing. Plaintiff's bankruptcy case was dismissed on March 12, 1992.

6. The jet was purchased for $700,000 and sold for $415,000 at a time when it was insured for $700,000. In *Frazier,* there was expert testimony on fair market value and similar sales in the industry.

receiving a monetary settlement, and the Court has no details of the respective settlement compromises. Moreover, the Court has no testimony that the Bank's representative ever inspected the vehicles. Finally, the best evidence of the Bank's position would have been the testimony of the Bank's witness about the condition of the vehicles and reasonable sales in the industry.

The consequences of a commercially unreasonable sale are set forth with great particularity in *Frazier*, to wit:

Finding that the sale was not commercially reasonable, it is necessary to address the fair market value of the plane at the time of sale to determine if the Chavers are nevertheless entitled to a deficiency judgment. There is some measure of speculation involved in ascertaining "what might have been". The risk of not being able to determine what would have happened as a result of a reasonable sale must fall on those responsible for the such a sale not actually occurring. Accordingly, once the determination has been made that the sale was not commercially reasonable, there is a presumption that the fair market value of the aircraft equaled the indebtedness secured or, in this case, the amount sought as deficiency. *United States v. Willis*, 593 F.2d 247, 251 (6th Cir.1979); *F.D.I.C. v. Morgan*, 727 S.W.2d 500, 501 (Tenn.App.1986). It is the burden of the secured party to rebut this presumption and failure to rebut the presumption with evidence of fair market value in the record results in denial of the secured party's claims for deficiency judgment. *Willis*, 593 F.2d at 261; *In Re: Anderson*, 50 B.R. 137, 142 (W.D.Mich.1985); *Morgan*, 727 S.W.2d at 502. (sic)

In the instant case, there was no evidence, other than the sales price, of what the fair market value of the vehicles was on the date of the sale, or the amount that would have been realized if the sale had been conducted in a commercially reasonable manner. Plaintiff, like the plaintiffs in *Frazier*, offered no evidence of a reasonable sale price other than the amount they obtained at the sale. Thus, the Court cannot fix a fair market value based on the evidence in the record. Plaintiff had the burden of proof on this issue, and plaintiff was in the best position to provide the Court with the evidence of fair market value, but failed to do so.

■■■■ This Court is without sufficient factual evidence to conclude that the presumption has been rebutted. That is, the plaintiff has failed to carry the burden of proof as to commercial reasonableness. *See, Investors Acceptance Co. v. James Talcott, Inc.*, 61 Tenn.App. 307, 454 S.W.2d 130 (1969). Therefore, the Court must presume that the fair market value of the vehicles at the time of the sale equaled the amount owed to the secured creditor. Further, the Court concludes presumptively that had the sale been conducted in a commercially reasonable manner, it would have yielded an amount sufficient to satisfy plaintiff's lien. *See Frazier, supra*; citing *United States v. Willis*, 593 F.2d 247, 261 (6th Cir.1979); *See also, Chavers v. Frazier*, 110 B.R. 827 (M.D.Tenn.1990). (District Court affirmed the Bankruptcy Court's denial of a deficiency claim where the sale was found to be commercially unreasonable).

Thus while debtor/defendant committed fraud, the Court finds that debtor's fraud is not the primary cause of plaintiff's loss. Plaintiff's unreasonable acts connected with the sale resulted in the loss.

### CONCLUSION

Plaintiff has met the burden of proof under 11 U.S.C. § 523(a)(2)(A) of proving that debtor/defendant obtained money, property, and services by fraud, where debtor caused his wife's signature to be forged on loan guaranty documents and where debtor misrepresented his financial condition, such that the debt should be declared nondischargeable. However, the Court also finds that in light of the hasty disposition of the collateral by private sale with no advertisement for a gross price of $6,000, or approximately 12% of the loan value and considering the totality of the facts and circumstances surrounding the sale, plaintiff has failed to carry the burden to show that the sale was commercially reasonable. As a result, plaintiff is denied a deficiency judgment. Stated differently, the Court presumes that had the sale been conducted in a commercially reasonable manner, plaintiff would have realized its lien value

and there would be no deficiency. Thus, defendant is not liable on his guaranty for any deficiency.

In light of defendant's fraudulent actions, the result may seem inequitable. The Sixth Circuit has instructed courts that it is inappropriate for courts to use equitable principles to circumvent clear statutory provisions. *In re Middleton Arms*, 934 F.2d 723 (6th Cir.1991).

Subsequent to the hearing, counsel for plaintiff filed an affidavit in support of his request for fees. In light of the Court's ruling, it is not necessary to consider the fee request.

**IT IS SO ORDERED.**